Ana Maria Alvarez Viuda De THOMAS,
et al., Plaintiffs,

v.

DELTA S.S. LINES, INC., Defendant and
Third Party Plaintiff,

v.

ANTILLES SHIPPING CORP. et al.,
Third Party Defendants.

Civil No. 751–70.

United States District Court,
D. Puerto Rico.

March 29, 1973.

336

**338**

Harvey B. Nachman, San Juan, P. R., for plaintiffs.

Vicente M. Ydrach, San Juan, P. R., for defendant and third party plaintiff.

Charles A. Cordero, San Juan, P. R., for Antilles Shipping Corp. and others, third party defendants.

OPINION AND ORDER

CANCIO, Chief Judge.

A substantial jury verdict in favor of plaintiffs plus the jury's exoneration of the third party defendants have triggered a group of passionately advanced post-trial motions. The action took three weeks to try, although in retrospect the facts and issues were relatively simple. Some narrative of the history of the case is necessary as a background for the rulings of the Court that appear below.

Charles Frederick Thomas had been born on the island of Tortola. He emigrated to Puerto Rico and in October, 1952, married Ana Maria Alvarez. He worked on the piers, spent a short time working in Michigan, returned to Puerto Rico and became a hatch foreman. Then, when Bull Lines went out of business and there were more hatch foremen than hatches, he returned to being a longshoreman. Meanwhile, he and Ana Maria Alvarez raised three sons, all veterans of the several branches of the Armed Forces, all high school graduates, all bilingual, all respectable working citizens. When Charles became eligible for Old Age Assistance benefits, he continued working but was careful to work just enough so that these benefits would not be lost. Apparently, he was in excellent health, strong and an accomplished longshoreman with the advantage of being bilingual.

On July 29, 1968, Charles Thomas was selected at the shape-up to work at hatch number three on the SS DEL SUD. This was a rather unique vessel, constructed as a passenger and cargo vessel. Number three hold contained refrigerated sections in the lowermost three decks and instead of the ordinary hatch opening, it had two elevators for the loading and discharge of cargo. When constructed, these elevators were equipped with shaft-doors and interlocks, and collapsible coamings that also had a lock and contact system to prevent the elevator from moving if the coamings were in the collapsed position. A master control panel was located on the weather-deck and individual control panels were located on bulkheads at each of the five tween-deck levels. These intermediate decks had no cut-off switch, but the master panel did. One hotly contested issue was whether the master control box also had a cut-off switch if the metal cover was closed.

While working in the lowermost deck on the aforesaid date, Charles Thomas and another worker were on the elevator platform (the elevator had no inside panels) aligning pallets on which heavy oil drums were to be placed. Thomas was at the forward edge of the platform with his back to the opening of the elevator shaft. Then, according to the tes-

timony of the eye-witnesses, the elevator started to rise. Thomas, knowing there was an emergency stop-cord in port-aft corner of the elevator shaft, turned to grab it. In so doing he lost his balance and one foot went over the side of the platform. He tried to get back into the elevator on top of the pallets (but he was now facing forward toward the hatch opening) to avoid the overhanging ledge or sill, which protruded into the shaft. Between the top of the hatch opening where his leg was caught, the overhanging sill, the pallets, and the constantly rising elevator platform, Charles Thomas was crushed and sliced in what may be one of the most horrible types of death that one can imagine, only that his suffering lasted a maximum of three minutes.

Eventually, the eldest son, a member of the United States Merchant Marines, contracted the services of New York trial lawyers. For reasons which need not be mentioned here, these attorneys never brought suit. After the file had been returned to the son, he then procured the services of local counsel. By that time, the statute of limitations had run and, under the applicable law, the doctrine of laches would not have saved the case. But, the Supreme Court decision of Moragne v. States Marine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L. Ed.2d 339 (1970), rescued the plaintiffs from the dismissal that was foreboding under the doctrine of The Tungus v. Skovgaard, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959) and related cases. The defendant, nevertheless, moved to dismiss the action and Judge Raymond J. Pettine, Chief Judge of the District of Rhode Island, sitting by special designation, found, on the issue of laches, for plaintiffs.

After an exhaustive pre-trial discovery, a pre-trial order was entered and the case set for trial. An expert and a witness, who had conducted a shipboard inspection for plaintiffs, came from Texas to testify. Two scale models of the elevator were built and admitted into evidence. An elevator expert was called, as were all available eyewitnesses, a pathologist and the plaintiffs. The defendant relied upon two former crew members and its local surveyor. The third party defendants presented no witnesses.

On special forms of verdict, approved by stipulation of all the parties, the jury, after deliberation, returned the following form of verdict:

"We, the jury, find for the plaintiffs against the defendant and assess their damages, as follows:

| | |
|---|---|
| To the heirs, Ana Maria Alvarez Viuda de Thomas, George A. Thomas, Frederick D. Thomas and Abel C. Thomas, for pain and suffering of the decedent | $80,000.00 |
| To Ana Maria Alvarez for her pecuniary loss | 20,000.00 |
| To Ana Maria Alvarez for her own suffering, grief and anguish | 30,000.00 |
| To George A. Thomas, for his own suffering, grief and anguish | 10,000.00 |
| To Frederick D. Thomas, for his own suffering, grief and anguish | 10,000.00 |
| To Abel C. Thomas, for his own suffering, grief and anguish | 10,000.00 |

Signed: Foreman."

With this setting we now turn to the motions.

## I

## DEFENDANT'S MOTION FOR A NEW TRIAL

The defendant advanced four grounds for a new trial. Naturally enough, the main thrust was directed at the quantum of damages awarded for the conscious pain and suffering in imminent awareness of death. No attack was made upon the $80,000.00 awarded for pecuniary losses and the personal losses of the four plaintiffs.

The evidence on the issue of the decedent's pain and suffering was that Charles Thomas moved to extricate himself from his peril the moment the elevator suddenly started to rise. He tried to pull the emergency stop cord and missed, his foot slipping off the platform into

space. Then, with his hands behind him he tried to push himself back onto the pallets. At or before the first contact with the projecting sill above him, he screamed "ay, ay, ay, mi madre" (oh!, oh'!, oh!, mother!). All of this was with the knowledge of impending doom. Yet, what has been related could not have taken more than four seconds.

Then his right leg was crushed and broken, his right clavicle was broken next; the former by the top of the elevator shaft opening, the latter by the projecting sill. The jury could reasonably have inferred from the testimony of the pathologist and the eyewitness that the sequence of events thereafter were the crushing and breaking of his right ribs by the projecting sill and his left ribs against the edges of the pallets. As he turned, the sill cut his back and his pelvis crushed as he was wedged between the sill and the platform. He lost blood and part of his insides from the cut on his back. The whole terrible catastrophe took, at most, one minute. The exact moment of death could never be pinpointed, but no more than three minutes elapsed from the start to the end of consciousness and death. The jury calculated the reasonable value of this suffering at $80,000.00.

As shocking as is the event, so is the award. It cannot stand. It is, in the opinion of the Court "outrageously excessive". New England Telephone and Telegraph Co. v. Reed, 1 Cir. 1964, 336 F.2d 90; Boston and Maine Railroad v. Talbert, 1 Cir. 1966, 360 F.2d 286; Braunstein v. Massachusetts Bank & Trust Co., 1 Cir. 1971, 443 F.2d 1281.

There are few guidelines that a Court can apply in determining the outer limit of permissible jury awards for such suffering and anguish. Obviously, the point at which the conscience of the Court is "shocked" is not the same, as saying, "what would I have given were the case tried before me without a jury." Undoubtedly, that is the subconscious starting point in an attempt to be intellectually honest. But what the Court might have given cannot be the whole test for that would be a mere substitution of the jury's function. Some reference to judicial standards must be made with full awareness that each case must be decided upon its own peculiar set of facts.

Three federal cases very much in point have been cited. Taking them chronologically by date of decision, we find startling similarities and one remarkable distinction. In Furumizo v. United States, D.Haw.1965, 245 F.Supp. 981, the Court, in cataloguing the damages, said:

"For decedent's pain and suffering during the descent of the Piper plane, its crash to the ground, and the burning of the decedent to death, the Court believing and finding from the evidence that he did suffer, however briefly, great agony from this horrible conflagration, [granted] $15,000.00."

On appeal, this issue was disposed of with these words:

"Finally, Baker says that $15,000 damages for decedent's pain and suffering is too much, because death was almost instantaneous (paragraph 71(a)). We do not find the award shocking. The question was primarily for the trial judge and we cannot hold that he erred. See Rohlfing v. Moses Akiona, Ltd. [1961. 45 Haw. 373, 369 P.2d 96]."

United States v. Furumizo, 9 Cir. 1967, 381 F.2d 965.

In Compañia Transatlantica Española, S.A. v. Melendez Torres, 1 Cir. 1966, 358 F.2d 209, 214, our Court of Appeals reversed a judgment based on a jury verdict that awarded $55,000.00 for the conscious pain and agony of a decedent, ordreing a new trial. In that case, a longshoreman stepped on a short hatchboard and fell thirty to forty feet. He never spoke again, and the conscious suffering was inferred from the groans which the evidence indicated may have been possibly associated with conscious pain.

The last case, Caldecott v. Long Island Lighting Company, S.D.N.Y., 1969, 298 F.Supp. 540, was a case of asphyxiation in a flash-fire. The trial judge refused to upset a jury award of $50,000.00 for conscious pain and suffering, saying:

"Fixing damages is a function peculiarly for the jury. Death by fire is recognized as one of the cruelest and most painful deaths. In spite of the short duration of consciousness, we are unable to say, in the light of the shrill intensity of the acute pain, that the jury's verdict is so high that permitting it to stand amounts to a denial of justice." 298 F.Supp. at p. 541.

The Court of Appeals ordered reversal unless a remittitur to $10,000.00 was accepted. Caldecott v. Long Island Lighting Company, 2 Cir., 1969, 417 F.2d 994, 997. The similarity in all these cases is intense pain of short duration. The difference is that in each of the cited cases there was an inference of consciousness and an inference of awareness of death. The decedent herein had conscious awareness of his impending fate before injury. There was direct credible evidence that was unrefuted to that effect. Pain, he certainly had. But as the Court has pointed out, consciousness could not have lasted more than three minutes.

The conscience of the Court was shocked to such an extent that, immediately following the reading of the verdict, as the record will show, it called all the attorneys to a conference at the bench to discuss this aspect of the award. Even though no suggestion was made regarding any possible change to the verdict before excusing the jury and though the conversation was off the record, the Court can announce now that, notwithstanding the fact that it would have awarded less than $20,000.00 for conscious pain and suffering of the decedent, had the Court been judging the facts, it thought for a moment that the jury misunderstood the instructions and, having estimated these damages in $20,000.00, they multiplied such amount by four, considering that there were four heirs, for the total of $80,000.00 awarded.

The Court is aware of the fact that there is no way of knowing now whether the jury thought in these terms, obviously erroneous, or not, and that any thought in that direction would be a mere speculation. The Court mentions it now with the only intent of showing how far from reality the Court thought, as its immediate reaction, this part of the verdict was.

Had the verdict for this item been of $20,000.00, the Court would not have pretended to disturb it, even though it would have considered it high. Perhaps we would have left untouched even a reasonable higher verdict. Therefore, taking all the factors into consideration and realizing that on the one hand precise mathematical certainty in this area is impossible, and, on the other, that damages are meant to compensate, not to punish, the Court finds the maximum permissible award for this item of damages is $25,000.00. Unless plaintiffs agree to remit all damages for the conscious pain and suffering of the decedent prior to his death in excess of said amount, a new trial will be ordered on this issue only.

Another ground defendant relies upon in its motion for a new trial is the admission of certain safety codes relating to elevators. At the pretrial conference a stipulation was prepared that indicated plaintiff would offer Coast Guard Regulations for electrical components of vessels and American National Standard Safety Code for Elevators, etc., 1937 and 1965 editions. While the defendant did not stipulate the admission of these standards, it could not claim surprise. The Court permitted no evidence that the elevators aboard the vessel were con-

structed in violation of Coast Guard Regulations because the vessel was built in 1947 and the earliest offered copy of the Regulations was 1955.

■ The defendant's witnesses testified that the alterations in the elevator assembly (removal of doors, interlocks and coamings) occurred after that date. Any change in such structures was defined by the Standards Code as a "major alteration". The Standards Code were incorporated into the Regulations by reference. The testimony of plaintiffs' elevator expert on this subject was impressive. He testified that since the first published Standards Code, all elevators were required to have doors, interlocks, enclosures, gates, locks and contacts, and beveled sills. Therefore, at least from the date of "major alteration", there was a violation of the Standards Code and the Coast Guard Regulations. However, instead of instructing the jury, as plaintiffs' counsel requested, that a finding of a violation was *per se* evidence of unseaworthiness or negligence (see Kernan v. American Dredging Company, 355 U.S. 426, 78 S. Ct. 394, 92 L.Ed. 382 (1958)), the Court instructed the jury that if they found that the Standards Code and the Regulations were violated, they could only take that into account in deciding whether the shipowner acted in a reasonably prudent manner, or in determining whether, under all the circumstances, the vessel was reasonably safe for its intended purpose. Prosser on Torts, Second Edition, § 34, pages 161–162. There was no prejudice to the defendant in the admission of these Codes or Regulations or in the instructions regarding their use.

■ Likewise, the objection based upon the alleged error in admitting the testimony of the expert and the investigator from Texas, is without merit. The Court limited Mr. Harold Armstrong's testimony to an actual description of the elevator, the holds, the measurements he made and the way the mechanism operated. Mr. Joseph Clayton, a former engineer and a qualified ship's surveyor, was permitted to testify as an expert. The plaintiffs, established that there had been no change in the equipment and method of its operation from the date of the accident until the shipboard inspection. Unquestionably, the testimony of Mr. Clayton was damaging to the defendant's cause. But no legal ground was advanced for its exclusion and the Court still finds none.

■ The final ground for the motion for a new trial was directed against the verdict in favor of the third party defendant. The shipowner claims that the accident was unforeseeable, and if the elevators were operated by the longshoremen as they had been instructed, the accident would not have happened. Quite apart from the misuse of the doctrine of foreseeability (See, e. g. Hall v. E. I. DuPont De Nemours and Co., Inc., E.D.N.Y.1972, 345 F.Supp. 353, and the cases cited therein), there was a credibility issue presented to the jury as to whether the lid of the main control box had an automatic cut-off switch which de-energized the system when the lid was closed. Photographs of the control box were admitted into evidence. Various witnesses testified to the existence or absence of such a device. Suffice it to say that the jury must have resolved the issue against the defendant and it had ample evidence to support its finding.

## TAXABLE COSTS

■ The defendant objects to the costs taxed by plaintiffs for expert testimony, costs incident to the shipboard investigation and depositions, and, costs of the models introduced into evidence. As to expert witnesses, this Court has already ruled in Virella Rivera v. Rederi A/B Nordstjernan, Civil No. 236–68,

order entered on June 17, 1971,[1] as follows:

"In Henlopen Hotel Corporation v. Aetna Insurance Company, [D.C.] 1965, 38 F.R.D. 155, it was held,

'. . . [f]or the same reasons as given above, I believe a Federal Court, in a diversity case, should, where proper, enforce an express state policy of taxing expert witnesses' fees as part of the costs'. As expressed by the Supreme Court of Puerto Rico, in Garriga, Jr. v. Superior Court, 1963, 88 P.R.R. 237, the policy in respect to costs is enunciated. That policy is to liberally exercise discretion in favor of all costs that are a) necessary, b) incurred, and c) reasonable. No one can gainsay the necessity of producing expert medical witnesses in a suit for money damages for personal injuries. The plaintiff's counsel has verified, under oath, that these expenses were actually incurred. The Court is aware of the fact that standard fees for expert medical witnesses in Puerto Rico range from $200. per half day to $500. for an appearance if the witness must lose the entire day from his practice. Considering the number of appearances, the Court concludes that these costs were reasonable."

■ The Court sees no reason to deviate from this ruling. Dr. Sorvil's fees of $250.00 for one day's testimony and Mr. Figueroa's fee of $400.00 for four days' testimony are allowed. Both of these witnesses were announced in the Pre-Trial Stipulation and Order. This is sufficient notice. What has been said about the Pre-Trial Stipulation and Order encompasses the testimony of Messrs. Clayton and Armstrong, as well. The added complaint that no costs should be charged for days that the witnesses did not testify, would have been meritorious were they in court to advise counsel. American Steel Works v. Hurley Construction Company, D.Minn., 1969, 46 F.R.D. 465, 468. But, Mr. Clayton, had to hear the fact witnesses before he could be called to give expert testimony, and unfortunately Mr. Armstrong was forced to stay over five extra days when the defendant prolonged its cross-examination and because of illness of the judge and the Friday motion calendar, the trial was not resumed until Monday. These witnesses were both necessarily present at trial, and the costs will be allowed. Commerce Oil Refining Corp. v. Miner, D.R.I.1961, 198 F.Supp. 895, 897; Garriga, Jr. v. Superior Court, 1963, 88 P.R.R. 237; 6 Moore, Federal Practice, ¶ 54.77/5/ at 1363–1364.

■ The Court has consistently recognized the right to tax costs for the taking of depositions and other discovery actually used at trial. Fourteen depositions were scheduled by defendant and plaintiffs' counsel had to attend. The depositions taken by plaintiff and the shipboard inspection were used at trial. The objection to this item is overruled.

■ The Court accepts the proposition advanced by defendant that the mere fact that expensive scale models were admitted into evidence, does not, *ipso facto*, convert the expense of preparation of these models into taxable costs. Judge Gignoux had analyzed the prior case law in the following manner:

"After a careful analysis of the foregoing cases, the following principles can be formulated: The reasonable expense of preparing charts, photographs, motion pictures and similar visual aids is properly taxable as costs when the exhibits have been received in evidence and have been of material

1. This case was affirmed on appeal. Rivera v. Rederi A/B Nordstjernan, 1 Cir. 1972, 456 F.2d 970 and certiorari was denied on October 10, 1972, 409 U.S. 876. 93 S.Ct. 124, 34 L.Ed.2d 128. The rulings on the issue of costs, however, were never raised on appeal.

aid to the court in resolving substantial and disputed questions of fact. The expense of such exhibits is not allowable when they are merely illustrative or repetitive of otherwise adequate evidence. The test should be 'the extent to which it was reasonable to go to furnish "real assistance" to the court'. Emerson v. National Cylinder Gas Co. [D.Mass.1957, 147 F. Supp. 543, aff'd., 1 Cir. 1958, 251 F.2d 152]. As stated in Barber-Coleman Co. v. Withnell [D.Mass.1928, 28 F.2d 543],

" 'To restrict the allowance of such costs to drawings and photographs which were absolutely necessary seems to me too narrow a rule. The expense of those which were admitted in evidence and furnished real assistance to the court in getting to the essential facts of a case ought in justice to be taxable.' "

H. C. Baxter & Bro. v. Great Atlantic & Pacific Tea Company, D.Me., 1968, 44 F.R.D. 49, 52.

■ The occurrence on the SS DEL SUD was not one that either a jury or the Court could easily visualize. The three dimensions of enclosed space is not easily reduced to a flat two dimensional photograph or diagram. Despite the facts that the models were included in the Pre-Trial Order and Stipulation and the pre-trial view that defendant's counsel was afforded, the models were not admitted into evidence or presented to the jury until a full scale voir dire on their admissibility was had. The Court finds that they provided a real assistance to both Judge and jury. They were expensive, but scale models usually are. Once admitted into evidence, and, parenthetically, it is noteworthy that this admission into evidence was not assigned as an error on which the motion for a new trial was based, they were utilized extensively by defendant's counsel himself in the examination and cross-examination of witnesses. The Court is satisfied that they met the test as re-

fined by Judge Gignoux. See also Kaiser Industries Corp. v. McLouth Steel Corp., D.Mich.1970, 50 F.R.D. 5. The objection to this item of taxable costs is overruled.

■ While the objections to plaintiffs' Bill of Costs have been disallowed, many of the disbursements claimed by the third party defendant are not taxable costs and fall without the purview of the express language of 28 U.S.C. § 1920. The transcription of the record and the depositions were necessary, used at trial, and taxable. Expert fees are not taxable, when such fees are paid for the private enlightenment of counsel and not for court testimony. Nor are the investigation expenses incurred by private investigators. 6 Moore, Federal Practice, ¶ 54.77(4) at p. 1723. The Court, therefore, disallows items III and IV of the "Costs Sheet" of third party defendant, totalling $2,773.-10. The Court finds that the Safety Codes and Regulations were necessarily procured for use of trial and are, under the cases cited above, taxable.

■ The attorneys' expenses may, for purposes of indemnity, be recoverable. Or they may be evidence of the reasonable fees to be awarded in the case of obstinacy, as shall be discussed below. But, they are not included in the statutory definition of taxable costs. Items VI and VII on the third party defendants "Costs Sheet" are disallowed. The total taxable costs recoverable by third party defendants under Items I, II and V are $344.10.

## PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND PRE-JUDGMENT INTEREST

■ In diversity cases the substantive law of the forum should be applied on such collateral issues as attorneys' fees for obstinacy. Despite the fact that the statutory provisions related with this matter are located in the Rules of Procedure of the Courts of the Commonwealth of Puerto Rico (32 L.P.R.A.

App. II, 44.4(d) and (e), the Supreme Court of Puerto Rico has deemed it a substantive provision. Under the law of Puerto Rico a Judge must exercise his discretion in determining whether the losing party has been obstinate. Once such a finding is made, the Court is bound to impose attorneys' fees. Zalduondo v. Mendez, 1953, 74 P.R.R. 597. Even when liability is admitted on the eve of trial, attorneys' fees must be awarded, Soto v. Lugo, 1954, 76 P.R.R. This provision of local law is recognized and applied in the federal courts. Pan American World Airways v. Ramos, 1 Cir. 1966, 357 F.2d 341. The practice of imposing attorneys' fees and pre-judgment interest is not unknown in the admiralty law. Petition of City of New York, 2 Cir. 1964, 332 F.2d 1006, 1008. This action was a diversity action based upon a maritime tort, not the death statute of Puerto Rico. A little more than a year ago, in a maritime personal injury case, as distinguished from a death case, the Court awarded both attorneys' fees and pre-judgment interest and the Court of Appeals affirmed. Rivera v. Rederi A/B Nordstjernan, 1 Cir. 1972, 456 F.2d 970. The Court finds that the defendant was obstinate in the handling of this case. Once that finding is made, the Court must determine on the particular facts what is a reasonable amount in this case. The Supreme Court of Puerto Rico has listed the factors, thusly:

> " . . . in fixing the amount of such fees there should be taken into account, besides the degree of guilt in the litigation, the work necessarily done by the attorney for the adverse party, and in connection with it there must be considered the nature of the litigation, the questions involved, the duration of the trial, the professional standing of the attorneys for both parties, and the amount in controversy."

Heirs of Trias v. Porto Rico Leaf Tobacco Co., 1941, 59 P.R.R. 228, 229.

Delta Steamship was clearly liable. Its vessel was, as found by the jury, unseaworthy. It negligently, in violation of all safety standards, removed all protection from the workers aboard its vessel. It had evidence in its possession that it, knowingly, imperilled longshoremen who are entitled to the protection of the humanitarian doctrine of unseaworthiness. Seas Shipping Company v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). Yet, it denied, to the very end, its liability. First, it moved to dismiss on a thesis that had been discarded by the Supreme Court in Moragne v. States Marine Lines, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 1970. Then, even after overruled, it persisted in motions alleging that under the law of Puerto Rico, damages are not recoverable for conscious pain and suffering prior to death, cf. Viuda De Delgado v. Boston Insurance Company, 1971, 99 P.R.R. ——, 99 D.P.R. 714, and Sanchez Gonzalez v. Liberty Mutual Insurance Company, 1971, —— P.R.R. —— (Col.Abog.No. 61–1971). This Court ruled that if the Supreme Court of Puerto Rico has not decided the issue and he were sitting as a court of the Commonwealth, his reading of those cases left but one conclusion, to wit, that the Supreme Court would rule that such damages are recoverable. But, even if it decided otherwise, the death here was maritime and governed by principles of damages that were no longer questionable. Moragne v. States Marine Lines, Inc., *supra;* Compañia Transatlantica Española, S.A. v. Melendez Torres, 1 Cir. 1966, 358 F.2d 209, 214.

Discovery was extensive, and information, including statements from crew members residing out of Puerto Rico and no longer employed by defendant, was given grudgingly and only after court order. The defendant took depositions of the eye-witnesses twice, and was given a deposition of plaintiffs' elevator expert and a view of the models referred to above.

This obstinacy persisted and there was no offer of settlement. All that occurred, according to the post-trial memoranda, was that defendant offered the defense to third party defendant, and further offered to contribute "5% to any reasonable settlement". Third party defendant reciprocated with a similar offer to the defendant. The plaintiffs were never offered anything. The defendant, even if it believed it had a good chance to recover indemnity, should have offered to settle with plaintiffs. Plaintiffs' offer to settle for $100,000.00 was reasonable, not only in the hindsight of the jury verdict, but with the experience that defendant's counsel had from recent jury verdicts in this Court. The procedure in such situations has been outlined in Waterman S.S. Corp. v. Dugan and McNamara, Inc., 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169 (1960), reversing King v. Waterman S.S. Corp., 3 Cir. 1959, 272 F.2d 823. See also Tankrederiet Gefion A/S v. Hyman Michaels Co., 6 Cir. 1969, 406 F.2d 1039 and Rivera v. Rederi A/S Nordstjernan, *supra*.

■ The nature of the litigation, one of the factors listed by the Supreme Court, never seems difficult after the trial is over. Counsel were all extremely competent and all enjoy excellent reputations, both as trial lawyers and in the maritime field. The competence and reputation comes from years of devotion to study and work. The trial involved not only the larger legal issues discussed herein, but also many questions of procedure and evidence, all capably presented on both sides. The amount involved, however, was not, as defendant contends, the amount expressed in the ad damnum clause of the complaint. That figure never goes to the jury. The settlement demand, vis-a-vis a potential jury verdict, is the only amount that this Court will consider in applying the tests of the Supreme Court of Puerto Rico.

■ The method of fixing attorneys' fees, whether on an hourly, work-done basis or percentage basis, is discretionary with the Court. In litigation such as this, where time records are seldom, if ever, kept by plaintiffs' counsel and the standard fees are contingent, and considering all other circumstances here present, the Court is of the opinion that a percentage of the award is the most rational method of fixing reasonable fees. Judges in the Commonwealth courts and in this Court have employed that method. In determining a percentage fee the Court bears in mind the specific considerations on which such an award should be based. Twentieth Century Fox Film Corporation v. Goldwyn, 9 Cir. 1964, 328 F.2d 190, 221–222.

■■ Like considerations are applicable here. This Court awards attorneys' fees for obstinacy to avoid court congestion, needless litigation and the delay of the redress of individual rights. The Court also has a policy consideration in insuring that the rights of indigents and the economically disadvantaged can be protected against the giant centers of power and more economically favored litigants, who sometimes abuse their economic advantage. The award of attorneys' fees for obstinacy is a means of making plaintiff whole since plaintiff must always pay his attorney, but evidence of such payment may not go to the jury. Taking all factors into consideration and applying them to this particular litigation and costly three-week trial, the Court finds that reasonable attorneys' fees for the plaintiffs are fifteen per cent (15%) of the reduced verdict, or, $15,750.00.

■ Pre-judgment interest will be awarded only from the date of the filing of the complaint and will be added only to the principal amount of the judgment, 32 L.P.R.A. App. II, Rule 44.4(e), Rivera v. Rederi A/B Nordstjernan, *supra*. Plaintiffs, unfortunately, are deprived of nearly two years of interest because of the mistake of their former attorney, but for this error in judgment, the defendant cannot be obligated to pay.

## THIRD PARTY DEFENDANT'S MOTION FOR ATTORNEYS' FEES

Third party defendant has filed a counter-claim. It was stipulated and ordered that this was an issue (Pre-trial Stipulation and Order), and that it would be tried to the Court alone. The issue is the obstinacy of the defendant in suing the stevedoring contractor. This is a more difficult issue, because the stevedore has such an imposing burden of law in his obligation to furnish workmanlike performance. Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956).

■■ But, indemnity is not automatically granted to the shipowner. The shipowner's conduct may preclude its right to indemnity. Albanese v. N.V. Nederl. Amerik Stoomv. Maats., 2 Cir. 1965, 346 F.2d 481, appeal (on indemnity) dismissed N.V. Nederl. Amerik Stoomv. Maats. v. International Terminal Operating Co., 382 U.S. 283, 86 S.Ct. 429, 15 L.Ed.2d 327 (1966). If the shipowner orders the stevedore to continue working in the face of known defects aboard the vessel, such as a defective winch, no indemnity is allowed. Torres Cruz v. Hudson S.S. Co., 1 Cir. 1963, 314 F.2d 44. A similar situation arises when a defect aboard the vessel is not readily discernible on a reasonably cursory inspection, or if the defect is latent. Quadrino v. SS Theron, S.D.N.Y. 1970, 323 F.Supp. 1037, affirmed, 2 Cir. 1971, 436 F.2d 959.

The Supreme Court has held in Federal Marine Terminals, Inc. v. Burnside Shipping Co., Ltd., 394 U.S. 404, 89 S. Ct. 1144, 22 L.Ed.2d 371 (1969), that the federal maritime law does impose a duty by the shipowner to the stevedoring contractor of due care under the circumstances. In that case, the obligations recited were:

> " . . . to give the stevedoring contractor reasonable warning of the existence of any latent or hidden danger which has not been remedied and is not usually encountered or reasonably to be expected by an expert and experienced stevedoring company in the performance of the stevedoring work aboard the ship, if the shipowner . . . in the exercise of ordinary care under the circumstances, should know of the existence of such danger, and the danger is one which the shipowner should reasonably expect a stevedoring contractor to encounter in the performance of the stevedoring contract." 394 U.S. at 416–417, n. 18, 89 S.Ct. at p. 1151.

■ In the case sub judice, the shipowner knew, or should have known, the potential danger that existed in manipulating these elevators with all of the safety features removed. In addition, the shipowner knew that there were control panels on all of the intermediate decks that were not acceptable to the stevedoring contractor and there was no evidence that the stevedore was favored with similar knowledge. The vessel had never been in San Juan before and as far as the longshoremen employees were concerned, this was a unique method of discharging cargo. The jury was, in the opinion of the Court, correct in concluding that the stevedore did not breach its warranty of workmanlike performance.

■ Furthermore, the Court finds that under the circumstances, the shipowner breached its concomitant duty of due care to the stevedoring contractor and is liable to the stevedoring contractor for its expenses and reasonable attorneys' fees. If the law of Puerto Rico were to apply, it would provide the same result through a different method of reasoning. Under said law, it would be found that the shipowner was obstinate in suing and demanding that the stevedore assume its defense. The shipowner had no evidence (other than the disputed cut-off switch on the lid of the main control box which the jury implicitly found did not exist) to substantiate its claim for indemnity. The shipowner

**348**

should have warned the stevedore or posted cards to protect the other control panels, or at least, provided constant supervision of the operators of the elevators by persons who were familiar in their manipulation.

Moreover, when the shipowner cavalierly rejected the stevedore's offer to contribute to a settlement, it knowingly exposed the stevedore to further trial expenses in defending a frivolous claim. The Court finds, therefore, that the stevedoring contractor must prevail on its counter-claim.

■ In fixing reasonable attorneys' fees for a defendant, the percentage method hereinbefore employed is useless. The reasonable fees must reflect the amount of work, the difficulty of the questions and the standing of the attorneys. The Court cannot give full credit to an unsupported allegation that the total time consumed in defending the stevedore's position was 500 hours. Nor, can the Court penalize the defendant just because the stevedore employed two different lawyers to defend its position. The Court allows the stevedoring contractor $4,000.00 in disbursements that it has rejected from the stevedore's Bill of Costs, and $10,000.00 for attorneys' fees.

### RECAPITULATION

Defendant's objections to plaintiffs' Bill of Costs are overruled. Defendant's objections to third party defendant's "Cost Sheet" are sustained as to Items III, IV and VI, and are overruled as to Items I, II and V. Plaintiffs' motion for attorneys' fees and pre-judgment interest is granted—the attorneys' fees being fixed in the sum of $15,750.00. Third party defendant's motion for judgment on its counter-claim is granted and the total damages are fixed at $14,000.00. Defendant's motion for a new trial is granted on the issue of damages for conscious pain and suffering, and anguish and awareness of imminence of death, only, unless plaintiffs

consent to remit all sums in excess of $25,000.00 on said issue of damages; if plaintiffs remit said sum, the motion for a new trial is denied.

Interest on the reduced amount of the jury verdict shall run from the 11th day of September, 1970, the date of the filing of the complaint. Interest on the costs, attorneys' fees and on the Judgment in favor of the third party defendant shall run from the date of the Amended Judgment, that shall be filed forthwith upon the entry of this Order.

It is so ordered.