Carmen **CARRILLO** vda De Cerich, for herself and on behalf of the infant Maria Del Carmen Escapa James (Cerich), Plaintiffs,

v.

**SAMAEIT WESTBULK and Johan Hagenes, Defendants and Third Party Plaintiffs,**

v.

**CARIBE SHIPPING COMPANY, INC., Third Party Defendant.**

Civ. No. 401–71.

United States District Court, D. Puerto Rico.

March 13, 1974.

Harvey B. Nachman, San Juan, P. R., for plaintiffs.

José Novas Dueño, Harry Anduze Montano, Hato Rey, P. R., for defendants.

## OPINION AND ORDER

TOLEDO, Chief Judge.

After a jury trial, verdicts were rendered in favor of the widow in the amount of $78,300.00, and on behalf of the decedent's adopted daughter, in the amount of $22,500.00. The jury also found in favor of the third party defendant on the indemnity claim. The defendants have filed post-trial motions for judgment notwithstanding the verdicts on both the main action and on the third party complaint. In the alternative, the defendants have moved for a new trial in both the case they were defending and in the case they were prosecuting as third party plaintiffs. The plaintiffs have opposed the motions directed against them and have moved for the imposition of prejudgment interest under both the law of Puerto Rico and the general admiralty law. The third party defendant has also opposed the motions against it and has moved for attorney's fees to be awarded to it for the third party plaintiffs' obstinacy.

The post trial motions have been thoroughly briefed and the Court, after due deliberation, makes the following dispositions:

## THE EVIDENCE

The decedent, a longshoreman, was employed by the stevedoring contractor on November 9, 1970, to work aboard the shipowner's vessel. The ship was loaded with automobiles. The decedent had been working since seven o'clock in the morning, when at 2:30 p. m. work was stopped because of rain. The longshoremen were on stand-by which meant, according to the testimony, that they could go to the midship house or stay anywhere aboard the vessel where they would be out of the rain. The decedent elected to get inside one of the automobiles. According to the defendants' and plaintiffs' witnesses, this was not an uncommon practice. Shortly before the end of the shift at 4:00 p. m., a signal was blown to end work. The longshoremen, except for the plaintiffs' decedent, left the vessel and the crew closed the hatches with automatic gear. No evidence was offered to show that the seamen inspected the hatch before closing it. There was neither light nor ventilation in the hold once the hatch covers were shut.

The following morning an inspection of the hold was made prior to the vessel's departure and the decedent's body was found near the ladder at the bottom of the hold some four or five levels below the tweendeck where he had been working and where he had last been seen about one-half hour prior to the whistle. There was no direct access from the tweendecks to the ladder. To reach the ladder from a tweendeck one had to step on a cleat in the escape hatch and then grab the ladder. The space between the tweendecks, which were completely removable, and the cleat was estimated at 2½ to 3 feet and slightly off level. There was evidence that the skull fractures that resulted in death were caused

when the decedent fell down the escape hatch, striking his head on the next lower tweendeck.

Experts were called by all sides as to the duty of inspection prior to closing of the hatches. There was ample evidence to show that inspections should always be made prior to the closing of hatches to safeguard the vessel, to protect the cargo or to ascertain that no longshoremen are left below, either ill, asleep (which the defendants' expert said was not uncommon after a standby), or as stowaways. The defendants were thus caught on the horns of a dilemma. If no inspection were conducted they were negligent and if one were conducted even cursorily, the decedent should have been discovered. There was a concession that a vessel's unlighted and unventilated hold is an unseaworthy condition.

The decedent had a working expectancy of 10.5 years and a life expectancy of 20.5 years. Because conscious pain and suffering prior to death would, under the circumstances outlined above, have entailed a considerable amount of speculation, plaintiffs were not permitted to prove such item of damage.

Vis-a-vis the plaintiffs, defendants contend that the decedent was not entitled, under the circumstances described, to the warranty of seaworthiness, and that the duty to inspect the hold was only to prevent damage to the vessel or the cargo. They argue that since the duty did not extend to the longshoremen, they could not have been negligent with respect to Alejandro Cerich, the decedent.

## UNSEAWORTHINESS AND NEGLIGENCE

Analogizing from the decision of Victory Carriers, Inc. v. Law, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971), the defendants contend that whatever duty they may have owed the decedent to supply and maintain a seaworthy vessel, that duty ceased the moment the discharging operations were concluded for the day. The analogy is inapposite.

In *Law*, the issue was whether there was maritime jurisdiction for shore-side accidents, unassociated with ship's gear, merely because the longshoreman was engaged in loading or unloading. The Supreme Court held there was none but it did not dilute the holdings of Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), nor of Gutierrez v. Waterman SS Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963). Mr. Justice White, speaking for the majority said in Victory Carriers, Inc. v. Law, supra, at 404 U.S., pp. 210–211, 92 S.Ct. at p. 424:

"The decision in Gutierrez turned, not on the 'function' the stevedore was performing at the time of his injury, but, rather, upon the fact that his injury was caused by an appurtenance of a ship, the defective cargo containers, which the Court held to be an 'injury, to person . . . caused by a vessel on navigable waters' which was consummated ashore under 46 U.S.C., Section 740."

Under the *Sieracki* doctrine, the longshoreman boards the vessel with the same rights of a seaman. He does not suddenly lose those rights if he stays aboard the vessel one minute beyond quitting time. As long as a longshoreman is aboard a vessel at the invitation of the owner, performing services traditionally performed by seamen, and as long as the longshoreman does no act inimical to the relationship, he is entitled to a seaworthy vessel, appliances, gear and crew. A humanitarian doctrine adopted for the protection of life and limb cannot be so abruptly terminated by the niceties of contractual concepts.

The defendants' stevedoring expert conceded that the hold was unseaworthy the moment it was closed—at least insofar as a human being trapped below. The pendulum of rights and duties may swing in a fluid society depending upon the exigencies created by the societal condition. But the defendants have miscalculated the sweep of the arc. Hu-

manitarian rights of workmen are not so easily dissolved.

█ The defendants' argument that they only owed a duty to inspect the cargo and therefore could not be negligent in failing to inspect for men is based upon foundations equally as flimsy. The defendants state their argument thusly: "A plaintiff who bases his action on the breach of a duty must be within the class of persons to whom the duty is owed. No action may be found upon a duty only to others". Professor Prosser is cited for this proposition but the statement is lifted from the text out of context. Professor Prosser is commenting upon the language adopted by various courts and explains that the word "duty" should never have been used in describing negligence. He says:

"In other words, 'duty' is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases the duty is always the same, to conform to a legal standard of reasonable conduct in the light of the apparent risk."

Later, in the same chapter, he makes the following comment:

"It is therefore not surprising to find that the problem of duty is as broad as the whole law of negligence, and that no universal test for it has ever been formulated. It is a short hand statement of a conclusion, rather than an aid to an analysis in itself."

There was conflicting testimony on the issue of whose duty it was to inspect the hold prior to the closing of the hatch. One of defendants' experts contended that the stevedore should have checked to see that all the men were out of the hold, and that the mates had to inspect only the cargo. Then the defendants produced a witness to prove that the absence of a notation of inspection in the ship's log did not mean that an inspection had not taken place. Thus, the jury could infer that defendants recognized their duty, inspected and conducted an unreasonably poor or negligent inspection. Or, the jury could infer that the defendants did, indeed, have the duty to inspect and negligently failed to do so. As for the contention that their "duty" only was to inspect the cargo and not for men, that is the question of foreseeability. Was there a likelihood that men might still be in the hold? The defendants' witnesses conceded as much. With this knowledge, any failure to inspect constituted negligence. See: Reinstatement of the Law Second, Torts 2d, Section 281, Comments g and j.

## COMPARATIVE NEGLIGENCE

The jury was presented with a special verdict form on only one issue—comparative negligence. This singling out of one issue in a case where several issues are to be tried may precondition the jury to make such a finding. The special verdict form was requested by the shipowner and no objections were lodged. Perhaps dutifully, the jury returned a verdict finding the plaintiffs' decedent 10% comparatively negligent and reduced the verdicts in the appropriate amounts. Neither plaintiffs nor third party defendants have challenged the finding, and, indeed, there was evidence to substantiate the verdict. The defendants, however, contend that this finding entitled them to a judgment notwithstanding the verdict on his third party complaint. They assert, that as a matter of law, if a jury finds comparative negligence on the part of an injured longshoreman, the shipowner must be indemnified in toto by the longshoreman's employer. There is a great body of case law to support this proposition, mostly from the Court of Appeals for the Second Circuit and the shipowner has exhaustively catalogued the cases.[1] The stevedoring contractor has

1. Mortensen v. A/S Glittre, (2 Cir. 1965), 348 F.2d 383; McLaughlin v. Trelleborgs Angfartyqs (2 Cir. 1969), 408 F.2d 1334; Hartnett v. Reiss Steamship Company (2 Cir. 1970), 421 F.2d 1011; Damanti v. A/S Inger (2 Cir. 1963), 314 F.2d 395; Shenker

just as assiduously catalogued a set of cases mostly from the Court of Appeals for the Fifth Circuit[2] alleging that the proper rule is that the comparative negligence of the injured longshoreman is a factor that may be taken into account in determining whether the stevedore breached its duty of workmanlike performance.

The difficulty the Court faces is that in making its finding of comparative negligence, the jury was not asked to specify the conduct of the decedent that it considered negligent. No one knows why the decedent remained aboard. If he had gone exploring there would be no doubt that his conduct was negligent and that his employer had breached its duty of workmanlike performance. But suppose he had become ill or even fallen asleep, the Court would be hard pressed to uphold a finding of comparative negligence, in view of defendants' experts' testimony that both of these situations were common, especially the latter during standby time in the rain. If the decedent heard the whistle and did nothing else, his conduct would have been negligent. If he heard the whistle and attempted to leave and the crewmembers closing the hatch did not give him enough time, he might not have been negligent. If he never heard the whistle, he would be negligent or not negligent depending in part on whether he was awake, ill, or doing something he should not have been doing.

In all of the cases cited by the defendants, the comparative negligence of the injured workman was both a proximate cause of the accident and a factor of breach of the warranty of workmanlike performance. In this case the jury could easily have determined that the dece-

dent's comparative negligence consisted of trying to escape from his entrapment. Despite the lack of ventilation, there was sufficient oxygen in the vast hold of this vessel. A cool, calm and collected longshoreman may have reasoned, once he found himself in the pitch black hold, that his best chance was to just stay put. Hunger and thirst could be endured for some time and sooner or later that hold had to be reopened. The Court is not saying that it would necessarily have found the decedent comparatively negligent for trying to get out of the hold, but that there was a likelihood that the jury may have done so.

If, in fact, this was the basis of the jury's finding, it does not follow that this negligence is imputable to the employer. The employer's warranty is to provide workmanlike service, not to supply a seaworthy vessel. After the hold was closed, the employer was providing no services. Even if one were to adopt the Second Circuit rationale, and this Court does not, under the facts of this case, find it necessary to adopt either rule as the exclusive and proper one, the stevedore warrants that its employee will be free from negligence in the performance of his work. The stevedore makes no warranty that a longshoreman will not be comparatively negligent in trying to extricate himself from a position of danger in which he was placed by the negligence of the crew and the inherent unseaworthiness of the vessel.

It was for this reason that the Court refused to instruct the jury as requested by defendants (Requests 32 and 33):

"32. Contributory negligence of a longshoreman is imputable to a stevedore's employer and becomes action-

v. United States (2 Cir. 1963), 322 F.2d 622; Nicroli v. Den Norshe Afrika (2 Cir. 1964), 332 F.2d 651; United States Lines v. Jarka Corporation (4 Cir. 1971), 444 F.2d 26; Chinese Maritime Trust Limited v. Carolina Shipping Co. (4 Cir. 1972), 456 F.2d 192.

2. Delaneuville v. Simonsen (5 Cir. 1971), 437 F.2d 597; Humble Oil & Refining Company v. Philadelphia Ship Maintenance Co. Inc.

(3 Cir. 1971), 444 F.2d 727; Shaw v. Lauritzen (3 Cir. 1970), 428 F.2d 247; Drewery v. Daspit Bros. Marine Divers, Inc. (5 Cir. 1963), 317 F.2d 425; Lusich v. Bloomfield Steamship Company (5 Cir. 1966), 355 F.2d 770; United States Lines Co. v. Williams (5 Cir. 1966), 365 F.2d 332; D/S Ove Skov v. Hebert (5 Cir. 1966), 365 F.2d 341; Jackson v. Trans World Marine Corporation (S.D. Ga.1969) 296 F.Supp. 1396.

able as a breach of the stevedore's warranty to perform stevedoring work in a workmanlike and safe manner.

"33. If the accidental death of Alejandro Cerich resulted solely from the negligence of the shipowners, without fault on Cerich or Caribe Shipping's part, then the shipowner should not be indemnified. On the other hand, if Cerich was contributorily negligent, or his employer failed to act in a safe and workmanlike manner, then the liability must fall on his employer, Caribe Shipping Company."

As has been stated, the facts of this case made it impossible to instruct Request Number 32, unless the specific conduct of the longshoreman that the jury might find negligent were to be reported. The defendants proposed no such special findings in their verdict form apparently for tactical reasons. Request Number 33 was perfectly proper if the phrase "if Cerich were contributorily negligent" were removed, although it would have been redundant since the Court had amply covered all phases of the third party claim which were covered in other instructions.

The issue on the third party claim boiled down to whose responsibility it was to check the hold prior to its being closed. There was evidence that could have supported either conclusion. The jury, as final arbiter, found in favor of the stevedoring contractor. Under a different factual context this Court might have concluded that their finding of comparative negligence on the part of Cerich would have required the granting of the motion for judgment notwithstanding the verdict. In this factual setting, however, and in the posture of the case when the parties presented it for resolution, the Court is convinced

that no error has been committed. The verdict is not inconsistent.

## DAMAGES

Defendants now claim that the jury awards are excessive because they include damages for loss of consortium, loss of society, grief and anguish, and according to their theory such damages are no longer recoverable since the decision in Moragne v. States Marines Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). *Moragne* reestablished the common law action for wrongful death, occurring within the navigable waters of a state, but the question of compensable damages was left for a future date. The Court stated:

"If still other subsidiary issues should require resolution, such as particular questions of the measure of damages, the courts will not be without persuasive analogy for guidance. Both the Death on the High Seas Act and the numerous state wrongful-death acts have been implemented with success for decades. The experience thus built up counsels that a suit for wrongful death raises no problems unlike those that have long been grist for the judicial mill."

398 U.S. at 408, 90 S.Ct. at 1792.

The post-*Moragne* litigation has demonstrated that judges do not always agree upon the essentials that constitute the miller's art, nor even upon the materials that are to be ground in the mill. A wide variety of opinions have been issued wherein some elements of damages are included by different courts or by different panels of the same court.[3] The sifting process has reached its climax, however, with the recent decision of the Supreme Court in Sea Land Services, Inc. v. Gaudet, 414 U.S.

---

3. Petition of United States Steel Company (6 Cir. 1970), 436 F.2d 1256; Simpson v. Knutsen (9 Cir. 1971), 444 F.2d 523; Greene v. Vantage Steamship Corp. (4 Cir. 1972), 466 F.2d 159; Dugas v. National Aircraft Corp. (3 Cir. 1971), 438 F.2d 1386; Spiller v. Thomas M. Lowe, Jr. and Associates. Inc. (8 Cir. 1972), 466 F.2d 903; Denis v. Central Gulf Steamship Corp. (5 Cir. 1972), 453 F.2d 137; Gaudet v. Sea Land Services, Inc. (5 Cir. 1972), 463 F.2d 1331; Petition of Canal Barge Co. (5 Cir. 1973), 480 F.2d 11, 1973 A.M.C. 843, 867–875; Mascuilli v. United States (S.D.N.Y. 1972), 343 F.Supp. 439; In re Sincere Navigation Corp. (E.D.La.1971), 329 F.Supp. 652.

573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974). There, the Supreme Court reaffirmed that *Moragne* "created a true wrongful death remedy—founded upon the death itself and independent of any action the decedent may have had for its own personal injuries." The Court went on to hold that the *Moragne* remedy includes damages for "loss of support, services, and society, as well as funeral expenses." (414 U.S. at 584, 94 S.Ct. at 814). Mr. Justice Brennan writing for the majority included within the concept of "services", "the nurture, training, education, and guidance that a child would have received had not the parent been wrongfully killed. Services the decedent performed at home or for his spouse are also compensable." (414 U.S. 585, 94 S.Ct. 815, footnotes omitted).

"Society", according to the Supreme Court, embraces "love, affection, care, attention, companionship, comfort and protection" (414 U.S. at 585, 94 S.Ct. at 815). It does not include mental anguish or grief. The distinction is adopted from the language of Speiser, Recovery for Wrongful Death, Section 3.45, p. 223.

Seizing upon this distinction, the defendants insist that at the very least a new trial on the issue of damages, or a remittitur is required. While conceding that loss of services and society are embraced within the *Moragne* type action, the grief and anguish of the widow is not and the jury was, they claim, improperly allowed to consider such damages. This was a jury trial and a fair reading of the complaint and the pretrial stipulation as well as the requested and unopposed instructions indicate that damages were sought under the law of Puerto Rico. The Supreme Court has stated in *Gaudet* that the *Moragne* type action may be coupled with a state survival statute and a jury may consider all items of damage. (414 U.S. at page 580, 94 S.Ct. at page 817 n. 24).

The defendants attempt to overcome this obstacle by alleging that this would permit a longshoreman or seaman killed in Puerto Rican waters to obtain a higher recovery than his stateside counterpart.[4] This, they allege, would not be compatible with the principle of uniformity that pervades the admiralty law.

In respect to maritime workers and their relation to federal maritime law, Puerto Rico is *sui generis*. The right to sue for maritime injuries or death which occur in the territorial waters of Puerto Rico does not have its genesis in the admiralty law even though in some instances the humanitarian principles of Sieracki v. Seas Shipping Co., supra, and its progeny have been found to be compatible with Puerto Rican law. In other instances, Puerto Rican maritime workers have been denied any relief at all except the benefits provided by the local workmen's compensation statute.

A half century ago, it was held that the admiralty law did not apply at all in Puerto Rican waters. Lastra v. New York and Porto Rico S. S. Co., (C.C.A. 1st, 1924), 2 F.2d 812. Years later, this doctrine was overruled but with some reservations. In Guerrido v. Alcoa Steamship Company (1 Cir. 1956), 234 F.2d 349, our Court of Appeals held that although Puerto Rico had power to legislate over its territorial waters in matter of local concern, it had not legislated maritime torts out of existence since there was nothing in the Puerto Rico Workmen's Accident Compensation Act, Title 11, Laws of Puerto Rico Annotated, Section 1, et seq. that prohibited third party suits, but in fact, they were specifically contemplated, Title 11, Laws of Puerto Rico Annotated, Section 32. That decision did not open the door to all federal rights legislated in favor of maritime workers. For example, the Jones Act, Title 46, United States Code, Section 688, which ostensi-

---

4. Most states do not permit any recovery for grief or anguish. Sea Land Services, Inc. v. Gaudet, supra, 414 U.S. at p. 585, 94 S.Ct. at p. 815, n. 17.

bly applies to all American seamen,[5] has been held to be inapplicable to Puerto Rican seamen hired in Puerto Rico by Puerto Rican employers provided their injury occur within the navigable waters of Puerto Rico. Fonseca v. Prann (1 Cir. 1960), 282 F.2d 153, cert. denied 365 U.S. 860, 81 S.Ct. 826, 5 L.Ed.2d 822 (1961). Compare Alcoa Steamship Company v. Velez (1 Cir. 1967), 376 F.2d 521, where it was held that the Puerto Rico Workmen's Accident Compensation Act cannot be applied to seamen injured in Puerto Rican waters on an American vessel owned by a corporation of a state other than Puerto Rico where the contract of employment was not entered into in Puerto Rico.

It has also been held that Puerto Rican longshoremen are not entitled to a seaworthy vessel if the vessel happens to be owned or demised by their employers. Perez-Rodriguez v. Alcoa Steamship Company (1 Cir. 1967), 376 F.2d 35, cert. denied 389 U.S. 905, 88 S.Ct. 215, 19 L.Ed. 219 (1967); Torres Ramos v. Beauregard (1 Cir. 1970), 423 F.2d 916.[6]

The Puerto Rican maritime worker is able to bring a third party suit or is barred from suing his employer, if a seaman, as the case may be, only by virtue of the Puerto Rican Workmen's Accident Compensation Act, Title 11, Laws of Puerto Rico Annotated, Section, 1 et seq. Whereas no state may enact workmen's compensation affecting workers injured or killed on navigable waters, without offending the uniformity requirements of the admiralty and maritime law, The Lottawanna, 21 Wall. 558, 88 U.S. 558, 22 L.Ed. 654 (1847); Southern Pacific v. Jensen, 244 U.S.

205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917); Knickerbocker Ice Co. v. Stewart, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834 (1920); State of Washington v. Dawson & Co., 264 U.S. 219, 44 S.Ct. 302, 68 L.Ed. 646 (1924), Puerto Rico may enact such legislation with no offense to the Constitution because of its peculiar relationship with the United States by way of the Territorial Clause (Article IV, Section 3, Constitution of the United States) and the Federal Relations Act (c. 145, Section 7, 39 Stat. 954 (1917); c. 446, Section 4, 64 Stat. 319 (1950)); Guerrido v. Alcoa Steamship Company, supra; Fonseca v. Prann, supra; Alcoa Steamship Company v. Velez, supra; Torres Ramos v. Beauregard, supra. However, such legislation has been held to be limited by the scope of Puerto Rico's legislative power so that it may not affect maritime workers employed outside of Puerto Rico or whose injuries occur outside of the territorial waters of Puerto Rico. Alcoa Steamship Company v. Velez, supra.

Thus we see that federal maritime rights of the blue water or *Sieracki* seaman in Puerto Rico all stem from what is permitted by the Puerto Rico Workmen's Accident Compensation Act, Title 11, Laws of Puerto Rico Annotated, Section 1 et seq., Title 11, Laws of Puerto Rico Annotated, Section 32. This Section, in turn, incorporates, insofar as third party actions are concerned, the rights and remedies provided by the Civil Code of Puerto Rico, Title 31, Laws of Puerto Rico Annotated, Section 5141.[7] Section 5141 has no counterpart in the Common Law. It is an all-encompassing tort statute that serves as the

5. It also applies to many foreign seamen injured or killed on foreign vessels. Hellenic Lines Limited v. Rhoditis, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). Compare the difference in result between Mpiliris v. Hellenic Lines, Limited, (S.D.Tex.1969), 323 F.Supp. 865, affirmed 5 Cir. 1971, 440 F.2d 1163, with our decision in Mojica v. Puerto Rico Lighterage Co., Inc. (D.P.R.1972), 357 F.Supp. 339.

6. The rule as to stateside longshoremen is just the opposite because the immunity afforded the employer by the Federal Long-

shoremen's and Harbor Workers' Compensation Act, Title 33, United States Code, Section 901 et seq. did not absolve the ship or its owner of its duty to comply with the seaworthiness warranty. Reed v. The Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963); Jackson v. Lykes Bros. Steamship Co., 386 U.S. 731, 87 S.Ct. 1419, 18 L.Ed.2d 488 (1967).

7. The entire text reads:
"A person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the

basis of recovery for all damage caused by negligence, intentional acts or violations of imposed obligations and which has been interpreted to include a wrongful death remedy and survival type actions.

Orta v. Porto Rico Railway Light & Power Co., 1927, 36 P.R.R. 668; Lopez v. American Railroad Co., 1936; Vargas v. Alers, 1948, 69 P.R.R. 215; Travieso v. Del Toro, 1953; 74 P.R.R. 940; Correa v. P. R. Water Resources Authority, 1961, 83 P.R.R. 139, Cirino v. P. R. Water Resources Authority, 1964, 91 P. R.R. 590; Commercial Union Insurance Co. v. Gonzalez Rivera (1 Cir. 1966), 358 F.2d 480; Santa v. United States, (D.P.R.1966), 252 F.Supp. 615.

In Compañia Trasatlantica Española, S.A. v. Melendez Torres (1 Cir. 1966), 358 F.2d 209, an action for wrongful death and a survival type action, it was held that Section 5141 was broad enough to encompass unseaworthiness through the breadth of the concept of "fault". The award of damages for grief and mental anguish were not disturbed by the Court of Appeals, even though there was a remand occasioned by the excessive award for the decedent's conscious pain and suffering prior to death. The admiralty law and its humanitarian policy is compatible and coextensive with the same policy that pervades the Civil Code. But if the admiralty law is more expansive in its remedies than those permitted by the Workmen's Accident Compensation Act of Puerto Rico, the latter governs. On the other hand, if said compensation act permits a greater recovery through the incorporation of the Civil Code provisions, it is the local wrongful death and survival act that controls. This creates no problem in uniformity and it is contemplated by the Gaudet decision that the "state" action may be joined with the *Moragne*-type suit.

The final contention of the defendants on the damage issues is that the award is excessive. In *Gaudet*, supra, Mr. Justice Brennan iterated his confidence in the jury system and the reasonableness of the judiciary by saying:

"We are confident that the measure of damages for loss of society in a maritime wrongful death action can 'be left to turn mainly upon the good sense and deliberate judgment of the tribunal assigned by law to ascertain what is just compensation for the injuries inflicted.' The City of Panama, 101 U.S. 453, 464, 25 L.Ed. 1061 (1879). As in all damage awards for tortious injury '[i]nsistence on mathematical precision would be illusory and the judge or juror must be allowed a fair latitude to make reasonable approximations guided by judgment and practical experience.' Whitaker v. Blidberg Rothchild Co., 4 Cir., 296 F.2d 554, 555 (1961). Moreover, appellate tribunals have amply demonstrated their ability to control excessive awards, see, e. g. Moore-McCormack Lines, Inc. v. Richardson, 2 Cir., 295 F.2d 583 (1961); Dugas v. National Aircraft Corp., 3 Cir., 438 F. 2d 1386 (1971)." 414 U.S. at 590, 94 S.Ct. at 817.

In this Circuit the test imposed by the Court of Appeals in determining whether a jury award has been excessive has been variously phrased " 'monstrous', 'outrageously excessive' or 'shocking to the conscience of the court . . .' ", United States v. Grigalauskas, (1 Cir. 1952), 195 F.2d 494, 498, or "unless it is so excessive that the district court's refusal to order a new trial constitutes a manifest abuse of discretion", Ganapolsky v. Park Gardens Development Corp. (1 Cir. 1971), 439 F.2d 844, 846, or "palpably excessive", Braunstein v. Massachusetts Bank & Trust Co. (1 Cir. 1971), 443 F.2d 1281, 1285. The evidence must be viewed most favorably to the plaintiffs, because the Court must be most reluctant to overturn a jury verdict, especially where the

---

damage so done. Concurrent imprudence of the party aggrieved does not exempt from liability, but entails a reduction of the indemnity".

sums include unspecified compensation for pain and suffering. Rivera v. A/B Nordstjernan (1 Cir. 1972), 456 F.2d 970, 974–975. Loss of services, loss of society, grief and anguish must, of necessity, fall within the same category.

After due deliberation, taking into consideration all of the evidence concerning loss of services, loss of society and grief, and considering the role played by the decedent in this household, this Court finds that the verdicts are well within the realm of reasonableness and do not shock the conscience of the Court. Taking into account the depreciated value of the dollar, the working and life expectancy of the decedent, and all other factors, the award does not seem to this Court to be overly generous or even influenced by sympathy. The verdicts should not be disturbed.

## OBSTINACY AND PREJUDGMENT INTEREST

This Court conducted the pretrial herein and called another conference immediately prior to the commencement of trial. For the nearly three years that this action was pending, there was never a concession of liability nor was there any settlement offer until just before the pretrial. That offer was, in the opinion of the Court, too low to be considered seriously by any conscientious plaintiff's attorney. From these conferences it was apparent that the defendants' principal issues were comparative negligence and indemnity. While the existence of comparative negligence may, in some situations, relieve a defendant from the consequences of a finding of obstinacy, here the matter was clearly negotiable. The fact that an indemnity claim may exist is no reason to compel a plaintiff to litigate endlessly just so that a defendant can utilize the plaintiff's preparation and expense. This Court has had occasion to deplore this practice several times in recent years. Rivera v. A/S Nordstjernan (1 Cir. 1972), 456 F.2d 970; Pizarro Felix v. Victory Carriers, Inc. (D.P.R.1972), 342

F.Supp. 1386; De Thomas v. Delta S. S. Lines, Inc. (D.P.R.1973), 58 F.R.D. 335.

Whereas the defendants were not willing to settle with plaintiffs the third party defendant was willing to so do on a contribution basis. The shipowner was only willing to have the stevedore defend in its stead. From the overwhelming evidence of unseaworthiness and negligence of the shipowner, this Court finds that the defendants were obstinate. Title 32, Laws of Puerto Rico Annotated, App. II, Rule 44.4(d); Soto v. Lugo, 1964, 76 P.R.R. 416; Rivera v. A/S Nordstjernan, supra.

Taking into account the various factors enunciated in Heirs of Trias v. Porto Rico Leaf Tobacco Co., 1941, 59 P.R.R. 228 and De Thomas v. Delta S. S. Lines, Inc., supra, this Court fixes the reasonable attorney's fees for plaintiffs in the amount of $12,500.00. Once a finding of obstinacy is made, not only are attorney's fees mandatory, Zalduondo v. Mendez, 1953, 74 P.R.R. 597, prejudgment interest from the date of the filing of the complaint are also obligatory. Title 32, Laws of Puerto Rico Annotated, App. I I, Rule 44.4(e); Rivera v. Rederi A/B Nordstjernan, supra; Petition of City of New York (2 Cir. 1964), 332 F.2d 1006, 1008.

The third party defendant must also be a recipient of an award of attorney's fees because of the third party plaintiffs' obstinacy. Pizarro Felix v. Victory Carriers, Inc., supra; De Thomas v. Delta S. S. Lines, Inc., supra. However, the third party defendants' counsel did not have to expend the time, effort and expense that plaintiff's attorney did and accordingly, the award in its favor is fixed at $7,500.00.

## SUMMARY

Defendants' motions for judgment notwithstanding the verdict on plaintiffs' complaint are denied. Defendants' motion for a new trial on plaintiffs' complaint is denied. Defendants' motion for a new trial, or, in the alternative, for a remittitur on plaintiffs' complaint

**130**

is denied. Defendants' motion for judgment notwithstanding the verdict on their third party complaint is denied. Defendants' motion for a new trial on their third party complaint is denied.

Plaintiffs' motion for the award of attorney's fees for obstinacy and prejudgment interest is granted; attorney's fees are fixed in the amount of $12,500.-00, to be pro-rated to the widow and child in the same ratio as the verdict of each bears to the total verdict. Prejudgment interest shall run on the jury verdict from the 9th day of June, 1971, and interest on the award of attorney's fees shall run from the date of the entry of this Order.

Third party defendant's motion for the award of attorney's fees for obstinacy is granted; attorney's fees in favor of third party defendant are fixed in the amount of $7,500.00. Interest on said award shall run from the date of the entry of this Order. The judgment entered after the jury verdict shall be appropriately amended. This is an Order.