COMMONWEALTH OF PUERTO RICO and the Environmental Quality Board of the Commonwealth of Puerto Rico, Plaintiffs,

v.

The SS ZOE COLOCOTRONI, her engines, appurtenances, etc., et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

M/V ZOE COLOCOTRONI, etc., et al., Defendants.

Civ. Nos. 252–73, 309–73.

United States District Court,
D. Puerto Rico.

Aug. 29, 1978.

Jiménez & Fusté, San Juan, P. R., for Com. of Puerto Rico.

Allen Van Emmerik, Dept. of Justice, Washington, D. C., for the U. S.

Hartzell, Ydrach, Mellado, Santiago, Pérez & Novas, San Juan, P. R., for defendants.

## DECISION

TORRUELLA, District Judge.

The present cases are the remnants of multiple suits[1] arising from the spillage of petroleum products by the SS ZOE COLOCOTRONI in the Caribbean Sea in the immediate vicinity of the Southwestern coast of Puerto Rico on March 18, 1973.

Civil Number 252–73 is a suit in admiralty, *in rem* and *in personam*, brought by the Commonwealth of Puerto Rico and its principal environmental agency, the Environmental Quality Board of the Commonwealth of Puerto Rico,[2] seeking recovery for various environmental damages and cleanup costs pursuant to the Solid Waste Disposal Act (42 U.S.C. § 6901 et seq.), the Water Pollution Control Act of Puerto Rico (24 L.P.R.A. 591, et seq.) and the Public Policy Environmental Act of Puerto Rico (12 L.P.R.A. 1121, et seq.). The Defendants in this suit are the SS ZOE COLOCOTRONI,[3] her owners, Marbonanza Compañía Naviera, S.A. and/or Colocotroni Ltd. and/or Colocotroni Brothers, S.A.,[4] and their underwriters, West of England Ship Owners Mutual Protection and Indemnity Association (Luxembourg) and West of England Ship Owners Mutual Insurance Association (London) Limited.[5]

Defendants' conduct during the pretrial discovery stages of this case and its companion suits was at best deliberately obstructive, and most probably also contumacious. These tactics culminated in the striking of their pleadings and defenses, and the dismissal of the petition for exoneration and limitation of liability in Civil Number 289–73.[6] The trial of this case was therefore limited to the issue of damages and matters relevant thereto.

Civil Number 309–73 is a claim by the United States of America against the COLOCOTRONI, her owners and West of England for cleanup costs resulting from

---

1. All suits were consolidated early in the proceedings. Civil Number 985–73, which involved a suit by a hotel for riparian damages and loss of business; Civil Number 268–73, a claim by the owners of the discharged petroleum to recover damages for its loss; and Civil Number 303–74, an action by various fishermen for property damage and loss of income, and by abutting salt pond owners for loss of income, were all settled prior to trial. Civil Number 289–73, a limitation and exoneration petition by the ship owner, was stricken for reasons indicated hereinafter.

2. Hereinafter referred to as the "Commonwealth" and "EQB" respectively.

3. Hereinafter referred to as the "COLOCOTRONI."

4. Hereinafter collectively referred to as the "owners", or as "Marbonanza" and "Colocotroni Brothers", respectively.

5. Hereinafter collectively referred to as "West of England", or as "West, London" and "West, Luxembourg", respectively.

6. See Minutes of hearing of October 21, 1977 and Opinion and Order entered on October 21, 1977.

the spillage, and for penalties pursuant to the Rivers and Harbors Act (33 U.S.C. §§ 407, 411, 412). At the commencement of trial summary judgment was entered on behalf of the United States for the cleanup costs. Hence, the only remaining issue in this action is whether said party is entitled to interest, penalties and attorneys' fees.

## BACKGROUND

The COLOCOTRONI is a motor tanker built in 1953. She is 605 feet, 2 inches, l.o.a., has a gross tonnage of 15,899 tons, and net tonnage of 9,654 tons. Her hold has 26 cargo tanks subdivided into 7 tanks forward, 12 tanks amidship and 7 tanks aft, where her machinery is also located.

Although her home port is Piraeus, Greece, her registered owner is Marbonanza, a corporation organized in the Republic of Panamá. The actual control over the vessel's management and operations was exercised by Colocotroni Brothers, two foreign corporations organized in Greece and Great Britain, respectively.[7] These companies had the joint responsibility for maintaining, provisioning, manning and insuring the COLOCOTRONI.[8] Colocotroni Brothers were Marbonanza's agents at all times pertinent herein.

On March 15, 1973 the COLOCOTRONI took on a load of 187,670 barrels of petroleum known as Tía Juana Crude, in La Salina, Venezuela. The crude was shipped by

Mobil Oil Company de Venezuela and consigned to the Commonwealth Oil Refining Company in Guayanilla, Puerto Rico. On this same day the ship departed for Guayanilla.

At 0200 hours on March 16, she was 5.5 miles abeam of Aruba Light and assumed a course of 032°. She continued on this course, proceeding by celestial navigation until 1859 hours on March 17, when the last star fix was taken. This sight established her position as approximately 80 to 85 miles due south of Puerto Rico.

At 1859 the COLOCOTRONI altered course to 033° and proceeded at a speed of 10.4 knots. From this point on she navigated by dead reckoning, the officer on watch advancing the 1859 star fix in accordance with estimated speed, drift and heading.

At 0110 hours of March 18 the vessel's speed was reduced to 7½ to 8 miles per hour. The ship was about 18 to 20 miles from shore. The wind was proceeding from about 75° at 25 miles per hour. A two knot current was moving from east to west and there was no indication of inclement weather.

As he approached the coast, Captain Anastacios Michalopaulos, the ship's master, was not able to establish the position of the COLOCOTRONI. At 0253 he decided to backtrack and ordered left rudder. As the vessel turned westward, it ran out of water and went aground.

---

7. Pursuant to earlier rulings, this Court held that both the owners and West of England were foreign corporations doing business in Puerto Rico and thus amenable to in personam jurisdiction pursuant to Puerto Rico's "long arm" statute. See Rule 4.7 of P.R. Rules of Civ.P. (32 L.P.R.A. App. II) and our Order of January 14, 1977.

8. The degree of control exercised by Colocotroni Brothers over the day-to-day operations of the COLOCOTRONI was absolute. They followed the ship by radio communication wherever she went, and from copies of her log abstracts, it appears that they directed her operations in detail. The ship's captain only had authority to purchase fresh vegetables, fruits and fish not to exceed £100. Any excess had to be approved by Colocotroni Brothers. This was also the case for any repairs in excess of £50. The approval of the London office was

required for all engine stores, paint, charts, rope, wire, tank cleaning, machines and hawsers, spare parts, spares for gyro and compass, and bridge equipment. The office in Piraeus approved all provisions, bonded stores, deck stores, cabin stores, and spares for radio and the radar.

The corporate relationships between the various Defendants here are of more than passing interest. J. J. Colocotroni, who managed Colocotroni Brothers, S.A., in Piraeus, was also a director of Colocotroni Ltd. of London. E.M.J. Colocotroni was in turn the manager of Colocotroni Ltd. of London. Coincidentally he is one of the members of the Board of Directors of West of England, the insurers of the COLOCOTRONI and Marbonanza in a policy with a $15,000,000 limit covering casualties such as the one here in question.

The COLOCOTRONI grounded at 0300 hours of March 18, 1973 at latitude 17°55' north, longitude 67°07' west, which is approximately 3 miles due south of the village of La Parguera in Southwestern Puerto Rico. The water depth at that point ranges from 30.5 feet to 35 feet as compared to the COLOCOTRONI's draft at the time of grounding of 33 feet 4 inches. Seven-eighths of the ship's length grounded.

Captain Michalopaulos attempted to refloat the vessel by "rocking" it, that is, by alternately running the engines full forward and back. About ten minutes after the grounding, it became apparent that this maneuver was ineffective. Without seeking outside assistance, Captain Michalopaulos proceeded to lighten the ship by dumping 5,170.1 tons of crude oil, or an equivalent 1.5 million gallons, into the sea.[9] By 1212 hours of March 18, the COLOCOTRONI was afloat and free.

In the meantime the oil slick, about one-tenth of a mile wide by four miles long, began to extend westward from the place of grounding towards Cabo Rojo on the Southwestern tip of Puerto Rico. At some time during March 18, the oil hit Margarita Reef, which is located three and one half miles southeast of Bahía Sucia. The oil immersed Margarita Reef at low tide and thus, when the tide filled, Margarita Reef became a source of oil in addition to the oil afloat. Sometime after dark on March 18, the oil slick reached the shore of Bahía Sucia, the locale of the present controversy. At one point the oil slick extended along the entire distance from Margarita Reef to Bahía Sucia.

## THE LIABILITY OF DEFENDANTS

■ The grounding, although accidental, was not surprising considering the state of the COLOCOTRONI and its crew. Although the immediate cause of the grounding was undoubtedly the fact that the ship's crew was hopelessly lost, the factors which directly contributed to this condition were the lack of proper charts on board,[10] the failure of the master to properly compensate for a westerly set in the current,[11] inoperative or defective navigation equipment,[12] the failure to post a bow lookout, and an incompetent crew.[13]

There is no doubt that at the time of grounding the COLOCOTRONI was in an unseaworthy condition, in that her charts, navigation equipment and crew were unfit to meet perils reasonably to be anticipated in her voyage. These were conditions which existed before the vessel left Venezuela and in fact for some time prior to departure. The COLOCOTRONI was thus unseaworthy at the commencement of the voyage in question and therefore her owners are not entitled to either exoneration nor, considering the substantial evidence of

9. Captain Michalopaulos was subsequently tried, found guilty and sentenced in the United States District Court for the District of Puerto Rico for violation of 33 U.S.C. §§ 1321(b)(5) and 1321(n). *United States v. Michalopaulos,* Cr. No. 61–73.

10. The COLOCOTRONI was navigating with U. S. Naval Oceanographic Office Chart No. 25008 which is a large scale chart covering Hispaniola to St. Lucia and which fails to show details of the coast of Puerto Rico. The ship did not have onboard U. S. Coast and Geodetic Survey Chart No. 901 which clearly depicts the place of grounding and other vital details.

11. To compensate for the westerly set and a 1.70° West gyro compass error, Captain Michalopaulos added three degrees east to the course. The gyro course was therefore 036°, while the true course was 033°. He thus allowed only 1.3° to compensate for the westerly set. Upon grounding the ship was 12.5 miles to the west of the rhumb line. From the last star fix at 1859 hours on March 17 to the grounding at 0300 on March 18, the set had displaced the COLOCOTRONI 12.5 miles west from where it should have been. Most probably, a contributing factor to this was that the COLOCOTRONI had no tide tables on board.

12. Among these were the gyro compass, the gyro compass recorder, and fathometer, the fathometer recording device, the radio direction finder, and the radar, all of which are of particular aid in pinpointing a position when approaching a coast at night, keeping in mind that the last fix was 8 hours earlier.

13. The Third Officer, the Radio Operator and various engineering officers were unlicensed. The Second Mate, who was also unlicensed, was not on board.

privity, to limitation.[14] *Waterman Steamship Corp. v. Gay Cotton,* 414 F.2d 724 (C.A. 9, 1969); *Empire Sea Food v. Anderson,* 398 F.2d 204 (C.A. 5, 1966), cert. den. 393 U.S. 983, 89 S.Ct. 449, 21 L.Ed.2d 444 (1968); *China Union Lines Ltd. v. Anderson & Co.,* 364 F.2d 769 (C.A. 5, 1966), cert. den. 386 U.S. 933, 87 S.Ct. 955, 17 L.Ed.2d 805 (1967), reh. den. 390 U.S. 974, 88 S.Ct. 1015, 19 L.Ed.2d 1191 (1968).

■ As the Court of Appeals for the Fourth Circuit has stated, in the context of a libel proceeding under the Harter Act:

"Our view of the law . . . is that charts, light lists, and similar navigational data are essential equipment for the save navigation of a ship, that she is unseaworthy without them, and it is the duty of her owner to supply them. Such documents of course become sources of information for the navigator, and the task of securing them is often delegated to officers of the ship. Failure to supply adequate information or navigation without it may thus constitute negligent navigation or management for which they are chargeable; but it does not follow that the owner is thereby relieved by the Harter Act from liability from ensuing disaster, because the same circumstances may also amount to failure on his part to use due diligence to make his vessel seaworthy. The duty of an owner in this respect is nondelegable; and the navigation of a ship defectively equipped by a crew aware of her condition does not relieve the owner of his responsibility or transform unseaworthiness into bad seamanship." *The Maria,* 91 F.2d 819, 824 (4th Cir., 1937);[15] also see: *The Iowa,* 34 F.Supp. 843 (D.C.Or., 1940).

Within the framework of this case, it should be pointed out that this broad duty giving rise to liability on the part of the owners for damages caused by an unseaworthy vessel encompasses the obligation to put it in charge of a capable crew. See *In re Liberty Shipping Corp., Motor Ship Don José Figueras,* 509 F.2d 1249 (C.A. 9, 1975), *Petition of United States,* 178 F.2d 243, 252 (2nd Cir., 1949); *The Trillora II,* 76 F.Supp. 50 (D.C.S.C., 1948). Exoneration of the shipowner has also been denied where the vessel was not equipped with an efficient radio direction finder and other necessary equipment, *Waterman Steamship Corp. v. Gay Cottons,* supra; *In re Seaboard Shipping Corp.,* 449 F.2d 132 (2nd Cir., 1971), cert. den. 406 U.S. 949, 92 S.Ct. 2038, 32 L.Ed.2d 337 (1972), reh. den. 408 U.S. 932, 92 S.Ct. 2488, 33 L.Ed.2d 344.

■ Another relevant factor which is evincive of fault on the part of the vessel was the failure to provide a bow lookout. Rule 29 of the International Rules of Navigation,[16] 33 U.S.C. § 1091, which apply to high seas navigation, provides:

"Nothing in sections 1061 to 1094 of this title shall exonerate any vessel, or the owner, master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

The International Rules promulgated by Congress are binding, of their own force, only on American vessels. However, Federal Courts are empowered to take judicial

14. These deficiencies are chargeable to Marbonanza and the Colocotroni brothers, since they had taken away from the Captain most of the authority and discretion relative to the maintenance and supplying of the vessel.

15. In the cited case the unseaworthiness of the vessel was attributed to the owner notwithstanding the fact that upon grounding, the cargo had been jettisoned to lighten the ship.

16. This set of International Rules, 33 U.S.C. §§ 1061–1094, came into force as a result of

recommendations of the International Conference for the Safety of Life at Sea of 1960, 16 U.S.T. 185. See, Exec. Order No. 11239, 32 Fed.Reg. 16247 (1965); Gilmore & Black, The Law of Admiralty, p. 490 (Second Edition 1975). In 1963, Congress authorized the President to proclaim the new Rules, 77 Stat. 194 (1963), and they became effective on September 5, 1965. Proc. No. 3632, 29 Fed.Reg. 19167 (1964). The Rules were still effective at the time of the casualty here in question. See Pub.L. 95–75, July 27, 1977, 91 Stat. 311.

notice that the other maritime nations have adopted Rules similar to the American provisions.[17] Gilmore & Black, supra, at p. 489; *The Scotia,* 81 U.S. 170, 20 L.Ed. 822 (1872). In *The Belgenland,* 114 U.S. 355, 370, 5 S.Ct. 860, 867, 29 L.Ed. 152 (1885), the Supreme Court stated:

. . . "[F]or more than twenty years past, all the principal maritime nations of the world (at least those whose vessels navigate the Atlantic ocean), have concurred in adopting a uniform set of rules and regulations for the government of vessels on the high seas. These rules and regulations have become international, and virtually a part of the maritime law. *They will be presumed to be binding upon foreign as well as domestic ships unless the contrary is made to appear.*" (Emphasis added. Citations and footnotes omitted).

 The COLOCOTRONI should have been at great pains in securing a correct course while navigating at night near the coast. Under such circumstances, she was bound to a high degree of vigilance and should have posted an effective lookout. See *British Columbia Co. v. Mylroie,* 259 U.S. 1, 42 S.Ct. 430, 66 L.Ed. 807 (1922). A clear rule of international navigation was transgressed by this omission. This constitutes further indicia of negligence. See, *Belden v. Chase,* 150 U.S. 674, 698, 14 S.Ct. 264, 37 L.Ed. 1218 (1893); *The Cleveco,* 154 F.2d 605 (C.A. 6, 1946); Gilmore & Black, supra at p. 489.[18]

 At the time of the grounding the COLOCOTRONI was also in violation of provisions of the International Convention for Safety of Life at Sea of 1960, supra, which imposes certain operational requirements on navigational equipment (Regulation 9(t), Ch. IV, Part C), such as properly calibrated and operative direction finders. (Regulation 11; also see Ch. V, Regulation 12). We have no doubt that the COLOCOTRONI was bound to comply with the safety provisions of this International Agreement.[19] It is also clear to us that the faulty equipment aboard the vessel was instrumental in bringing about the casualty giving rise to the present action. This state of affairs is not only indicative of negligence on the part of the Defendants, but also brings into play the application of the so called Pennsylvania Rule whereby a presumption is raised to the effect that these violations were a contributory cause of the disaster. *The Pennsylvania,* 86 U.S. 125, 22 L.Ed. 148 (1873); *The Martello,* 153 U.S. 64, 14 S.Ct. 723, 38 L.Ed. 637 (1894); *Waterman Steamship Corp. v. Gay Cotton,* supra.[20]

 Moreover, apart from the applicable presumptions, we are convinced that the unseaworthiness[21] of the COLOCO-

---

17. The International Convention for the Safety of Life at Sea of 1960, supra, was ratified by the United States (August 2, 1962), proclaimed by the President on March 24, 1965), Greece (February 13, 1963) and Panama (February 4, 1963). 6B *Benedict on Admiralty,* p. 1064. It is interesting to note that several of the ship's papers (such as the radio telegraphy certificate issued by the inspection service of the Ministry of Merchant Marine of Greece) and various correspondence and directives from the owners, make specific reference to the application of this Convention to the operation of the COLOCOTRONI.

18. It is a well established rule of collision litigation that a presumption of fault attaches to a moving vessel which collides with a fixed object, making a prima facie case of fault or negligence against the vessel. See *The Oregon,* 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1895); *Brown & Root Marine Operators Inc. v. Zapata*

*Offshore Co.* 377 F.2d 724 (C.A. 5, 1967); *Petition of M/V Elaine Jones,* 480 F.2d 11 (C.A. 5, 1973).

19. See n. 17, supra.

20. The Pennsylvania Rule, although originally developed in connection with collision law, is applicable to strandings. *Richelieu & Ontario Navigation Co. v. Boston Marine Insurance Co.,* 136 U.S. 408, 422–423, 10 S.Ct. 934, 34 L.Ed. 398 (1889); cf. *Director General of India Supply Mission v. SS Maru,* 459 F.2d 1370 (C.A. 2, 1972).

21. We recognize that the COLOCOTRONI and its owners owed no duty to provide the Commonwealth of Puerto Rico with a seaworthy vessel, in the sense that said doctrine of absolute liability is traditionally invoked. See, *State of Maryland Dept. of Natural Resources v. Amerada Hess Corp.,* 350 F.Supp. 1060,

TRONI and the negligence of her owners proximately caused the injuries asserted herein. There is a "causal relation" between the acts or omissions and the injury, if the things done or omitted produce immediate danger of injury and are substantial factors in bringing it about, even though the precise result may not be foreseen. *Interlake Iron Corporation v. Gartland S.S. Co.*, 121 F.2d 267 (C.A. 6, 1941), cert. den. 314 U.S. 681, 62 S.Ct. 181, 86 L.Ed. 545 (1941). Clearly the deplorable condition of the COLOCOTRONI was within the knowledge of her owners. In light of the attending circumstances, they ought to have foreseen the probability of injury as a result of the vessel's unseaworthiness, as it existed at the commencement of the casualty voyage.[22] See *Reynolds v. Atlantic Coast Line R. Co.*, 196 F.2d 643 (C.A. 5, 1952).

In view of the foregoing,[23] we hold that the owners of the COLOCOTRONI are responsible for the damages resulting from the dumping of oil undertaken to save the stranded vessel.

### THE STANDING OF PLAINTIFFS TO RECOVER

One of the issues in Civil Number 252–73 deals with the standing of the Commonwealth and the E.Q.B. to sue for damages.

As stated previously, the oil slick came ashore at Bahía Sucia, in Cabo Rojo, Puerto Rico. The Commonwealth and E.Q.B. are claiming damages for the environmental damage caused by this pollution to the natural resources of this area.

The Commonwealth of Puerto Rico is a sovereign organized within the legal and political framework of the United States (48 U.S.C. §§ 731–916; 1 L.P.R.A. (Constitution of the Commonwealth of Puerto Rico); *Mora v. Mejias*, 115 F.Supp. 610 (D.C.P.R., 1953); aff'd 206 F.2d 377 (C.A. 1, 1953); Resolutions of the General Assembly of the United Nations of November 3, 1953, A/C.4/L 300, and November 27, 1953, A/PV 459), which possesses many of the attributes of a State. *Mora v. Mejias*, supra, (C.A. 1, 1953); *Ursulich v. P. R. National Guard*, 384 F.Supp. 736 (D.C.P.R., 1974). As a sovereign it represents the collective interests of the People of this jurisdiction. The Commonwealth holds title in trust to the public property and domain, and is charged with the protection of the People's interest in the same. 1 L.P.R.A., Const. P.R. Art. VI, Sec. 8; 1 L.P.R.A. 2; see *Geer v. Connecticut*, 161 U.S. 519, 529, 16 S.Ct. 600, 40 L.Ed. 793 (1859). In the execution of these endeavors the Commonwealth may bring legal actions in court to protect its property and to recover damages to the same. 3 L.P.R.A. 73.

The United States has transferred to the Commonwealth all interest it had in the navigable waters of Puerto Rico and their resources, and in the submerged lands and their resources. See 48 U.S.C. §§ 746, 747, 749. The Commonwealth has title to all beaches and to the maritime terrestrial zone abutting the navigable waters, and in particular to the mangrove areas which are a part of the same. *Robert Armstrong v. Commonwealth*, 97 P.R.R. 573 (1969). The Commonwealth is thus the owner of both the living and nonliving resources located in the navigable waters of the Commonwealth and those on the bottom and its subsoil, as well as those located within the referred to maritime-terrestrial zone. 12 L.P.R.A. 43, 44. See *McCready v. Virginia*, 94 U.S. 391, 394, 24 L.Ed. 248 (1876); *Toomer v. Witsell*, 334 U.S. 385, 408, 68 S.Ct. 1156, 92 S.Ct. 1460 (1947); *Manchester v. Massachusetts*, 139 U.S. 240, 11 S.Ct. 559, 35 L.Ed. 159 (1890); *Skiriotes v. Florida*, 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193 (1941).

---

1070–1071 (D.C.Md., 1972). However, the Commonwealth's suit is not precisely couched in terms of a privity between the parties. Our finding of unseaworthiness in this case thus constitutes another indicia of negligence on the part of the Defendants. See, generally, Gilmore & Black, supra, Chapter VII.

**22.** It is our opinion that the likelihood that oil might have to be jettisoned from the stranded vessel was one of the hazards inherent in her unseaworthiness. See *2 Restatement of the Law, Torts 2nd,* § 449 (1965); Cf. *The Maria*, supra.

**23.** And also considering the procedural history of this litigation, see n. 6, supra.

The Commonwealth therefore has standing to sue to recover for oil pollution harm to Bahia Sucia and related resources because it has a proprietary interest in the same. (*State of Maine v. M/V Tamano*, 357 F.Supp. 1097, 1098–1099 (D.C. Me., 1973); *State Department of Fish and Game v. SS Bournemouth*, 307 F.Supp. 922, 926–930 (C.D.Cal., 1969)), and because it is the trustee of the public trust in these resources. *Geer v. Connecticut*, supra, at 534; *State of Maryland, Department of Natural Resources v. Amerada Hess*, supra, n. 20 at 1065–1067; *State Dept. of Environmental Protection v. Jersey Central Power & Light Co.*, 124 N.J.Super. 97, 308 A.2d 671 (1973); see *"The Public Trust Doctrine in Natural Resource Law: Effective Judicial Interaction."*, 68 Mich.L.Rev. (1970); *"Environmental Law—Public Trust—Inquiry to Public Trust as Basis for Award of Damages"*, 5 Seton Hall L.Rev. 394 (1974). Additionally, in its capacity as *parens patriae*, the Commonwealth has a sovereign interest in the general welfare of its citizens which transcends any injury which may be caused to its proprietary interests or to the property of its individual citizens. Particularly when a nuisance of disastrous proportions occurs such as in the case of a maritime oil spill, the special status of the body politic vis-a-vis its citizens gives rise to a right to seek redress on behalf of the collective community which is not limited to the abatement of the nuisance, but which can allow for recovery for damages by the body politic. · *Missouri v. Illinois*, 180 U.S. 208, 241, 21 S.Ct. 331, 45 L.Ed. 497 (1901); *Louisiana v. Texas*, 176 U.S. 1, 20 U.S. 251, 44 L.Ed. 347 (1900); *Georgia v. Pa. R. Co.*, 324 U.S. 439, 447, 65 S.Ct. 716, 89 L.Ed. 1051 (1945); *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237, 27 S.Ct. 618, 51 L.Ed. 1038 (1907); *Maine v. M/V Tanamo*, supra. See, *"State Protection of Its Economy and Environment, Parens Patriae Suits for Damages"*, 6 Col.J. of L. & Soc. Prob. 411 (1970).

The E.Q.B. is clearly granted standing to sue for environmental damages by its enabling statute. 12 L.P.R.A. 1131(29). It of course, does not recover damages separate and apart from the Commonwealth.

## PLAINTIFFS' DAMAGES AND RELATED SUBJECTS

### Bahía Sucia

The issue of the damages suffered by Plaintiffs and the recovery to which they are entitled, which are the real cruxes of the present cases, must necessarily begin with a description of the impacted areas as well as of the various flora and fauna within their confines, as they existed in March, 1973, *prior to the spill*.

Bahía Sucia is a half-moon shaped bay which, as previously stated, is located in the extreme Southwestern part of Puerto Rico. (See Appendix A). Its westernmost point is Cabo Rojo and its eastern boundary is Punta Molino. There is a distance of approximately 2 miles from point to point across the mouth of the Bay, and of 4 miles along the beach.

Bahía Sucia faces the southeast. The center of the half-moon is about 4 miles to leeward of Arrecife Margarita, and 8 miles to leeward from the site of the COLOCOTRONI's grounding. The prevailing daytime winds and the normal currents are generally from an easterly and southeasterly direction, in line with the location of the grounding, Arrecife Margarita and the mouth of Bahía Sucia. During the nighttime the wind usually shifts to the north or northeast. The average rainfall for this area is 30 inches a year, offset by an evaporation rate of 80 inches. By reason of this high rate of evaporation, the area is classified as semiarid.

The shoreline, commencing at the western extremity of the Bay, is mostly composed of rocky limestone to the water's edge, with some fringe coral. These characteristics remain unaltered for approximately three quarters of a mile until the shoreline begins to curve to the north.[24]

---

24. Inland of this location there is a large landlocked salt water pond separated from the Bay by a thin strip of land. Considerable dead mangrove was evident in the lagoon, unrelated to the present case.

There a thin line of mangrove appears, increasing in width as the shore curves to the north. About a quarter mile from that point there is a small strip of sandy beach referred to as "Dogman's Cove."[25] Immediately thereafter there exists a cove, which is formed in part by a peninsula of mangrove, referred to as "Hermit One."[26] This cove is entirely surrounded by mangrove which goes inland to a width of several hundred yards in places, and whose total area is in the vicinity of 50 acres. On the land side of this mangrove area there is a large flat which borders on the west with a dirt road. This flat, which was inhabited by large numbers of crab, is flooded by the tide at high water. Several scattered stands of dead mangrove stood on the southern edge of this flat. Proceeding north from this mangrove area, which is generally referred to as the "West Mangrove",[27] the shoreline becomes white calcareous sand for the next mile and three quarters, and curves in a northeasterly direction. This beach was inhabited mostly by hermit and sand crab. Immediately inland of this portion of the Bay, separated by a thin strip of brush covered land, is a large salt water lagoon several hundred acres in area, which is subdivided into evaporating ponds for the nearby salt factory. Behind the extreme eastern end of the beach there is another flat which is also flooded by the tide and was inhabited by ghost crabs (*Ocypode albican*) and fiddler crabs (*Uca sp.*). At this end of the beach there commences another area of mangrove which runs east for about a mile. It stops short of Punta Molino. This mangrove area is referred to as the "East Mangrove",[28] and its width inland rarely reaches 50 yards from the shore. Much of the landward side of this mangrove stand contained patches of dead mangrove.

The mangrove that borders on the ocean fringe throughout Bahía Sucia is of a species referred to as red mangrove (*Rhizophora mangle*). This mangrove has both main and prop roots, in which are located lenticels or pores for gas exchange. These lenticels facilitate root respiration. Various epibenthic species such as tree oysters, snails, crabs, sponges and molluscs dwelled in these roots systems.[29] In the waters surrounding these roots, communities of fish, shrimp and similar floating or swimming organisms throve. The bottom around the roots was inhabited by various benthic infauna.[30] The bottom near the red mangrove was covered with both turtle grass (*Thalassia testudinum*) and manatee grass (*Syringonium sp.*).

Further inland from the fringe, as the interstitial salinity rises, the red mangrove is supplanted by the black mangrove (*Avecennia nitida*). This mangrove inhabits a zone systematically flooded by the tide, and rather than prop roots, it has fingerlike breathing tubes (called neumatafors) which rise from the ground to above high water level. This area provided a habitat principally for crustaceans such as crabs and barnacles, and algae grazing snails, bees and reptiles. There were also benthic infaunal communities similar in nature to those in the bottom surrounding the red mangrove fringe.

25. This is not an official name, but a label that was given by the Court for easy reference to this location.

26. Id.

27. Id.

28. Id.

29. Included were annelids (*Polychaete* families of several types), arthropods (*Amphipoda, Cirripedia, Decapods [Brachyrhyncha, Majidae* and *Caridea], Isopoda, Tanaidacea*), coelenterates (*Hydrozoa*), molluscs (*Bivalvia, Gastropoda*, and *Aspidobranchia*), sponges (*Porifera*, encrusting tan sponge), chordates (*Tunicata*, colonial and solitary; and fish larvae), algae (*Bostrichia sp.*, Filamentous Types A, B and C, *Caulerpa racemosa*, Red Filamentous Type C), roundworms (Nematode-Type A).

30. Included were annelids (*Polychaete* families of several types), roundworms (*Nematoda*), arthropods (*Amphipoda*, and *Isopoda*), coelenterates (*Anthozoa*), echinoderms (*Ophuiroidea*), molluscs (*Bivalvia, Gastropoda* and *Aspidobranchia*), ribbonworms (*Nemertinea*) and sponges (*Porifera*).

The canopy of the mangrove forest was inhabited by various bird species.

The configuration of the bottom of Bahía Sucia is of some relevance. The average depth at the middle of the mouth is about 4 fathoms, or 26 feet. From there the bottom slopes gradually, paralleling the shore in half-moon fashion until it reaches land. With the exception of one small reef, Roca Ola, located about one mile due east of Hermit One, the bottom was white calcareous sand covered mostly by turtle grass. Both pelagic and neritic fish species inhabited these waters. Additionally various epibenthic species [31] such as starfish, sea urchins, brittlestars, snails, limpets, hermit crabs, sea cucumbers, lobsters, helmet conch, and sponges were found in the *Thalassia* beds, and again substantial benthic infaunal communities [32] existed beneath them. The *Thalassia* is a basic food source for sea turtles and manatees.

As its name seems to imply, Bahía Sucia, because of its location and configuration as well as by reason of the prevailing winds and currents, collects and traps much debris along its shores. Among the matters that periodically came ashore were small amounts of petroleum products.[33] This is mostly discernible to the eye in the form of tar balls,[34] which can be best seen in the sandy areas of the shore.

Notwithstanding this, it is clear to us that at the time of the casualty in question Bahía Sucia was a healthy, functioning estuarial ecosystem, typical of those found in the Southern coast of Puerto Rico and similar tropical environments. The function and interrelationship of such systems are scientifically well-established and understood.[35] The mangrove components of these systems are of prime importance. These areas are breeding, feeding and nursery grounds for substantial populations of the species previously mentioned. Additionally the mangroves themselves, and in particular the red mangrove, are the primary food-producing agents of the organic materials available to the aquatic food chain.

The *Thalassia* beds perform a similar but less prominent function than do the mangrove, providing both habitat and an important component in the food chain of the various species referred to previously.

### The oil spill and the cleanup

As the oil slick started arriving in Bahía Sucia on March 18–19, 1973, its initial point of impact was the southwestern third of the half-moon.

By 0755 hours of March 19, with the wind due east, three separate pools of oil had formed against the shore of Bahía Sucia: one was located against the rocky shore at the western extremity of the Bay, the second was in the West Mangrove, extending from Dogman's Cove to and including the mangrove around Hermit One, and the third was along approximately 3,000 feet of the beach to the north of the second oil pool. The oil was black and thick, particu-

31. Included were annelids (*Polychaete* families of several types), arthropods (*Decapoda, Paguridae, Brachyrhyncha, Penaidea, Scyllaridea, Majidae* and *Acarina*), coelenterates (*Anthozoa* and *Zoanthidea*), chordates (*Tunicata*), echinoderms (*Crinoidea, Echinoidea* [sea urchins], *Holothurioidea, Asteroidea,* and *Ophiuroidea,* molluscs (*Bivalvia,* eight *Gastropoda* genera, and *Polyplacophora*) and, sponges (*Porifera*).

32. Included were annelids (*Polychaete* families of several types), roundworms (*Nematoda*), arthropoda (*Amphipoda, Decapoda, Pycnogonida* and *Isopoda*), coelenterates (*Anthozoa*), chordates (*Tunicata*), echinoderms (*Ophiuroidea, Echinoidea* and *Holothurioidea*) and molluscs (Five *Bivalvia* genera, thirteen *Gastropoda* genera, and *Polyplacophora*).

33. The apparent result of fortuitous bilge cleaning by ships at sea.

34. The sizes vary anywhere from almost microscopic to several inches in diameter. How they form and their relevance, if any, to this case are discussed later in this opinion.

35. Ex. see, *Coastal Ecosystem Management*, John R. Clark, John Wiley & Sons, New York, in particular the contributed articles, "Mangrove Swamps", by Lawrence Burns, pp. 660–665, and "Sea Grass Beds", by Joseph Zieman, pp. 702–704.

larly in the West Mangrove and in the beach areas. In the West Mangrove the oil was several inches thick and completely enveloped all areas subject to tidal flow. The oil there reached into all the recesses including Dogman's Cove and Hermit One, which were totally surrounded by oil. Because of the rise and fall of the tide, the intertidal portions of the main and prop roots of the red mangrove, and the roots and neumatafors of the black mangrove in this area were covered by oil to a height of about one foot above their low water level. At high tide, the oil also floated into the flats behind this area.[36]

Meanwhile, early on the 19th of March, a large cleanup force composed of members of the United States Coast Guard and various Commonwealth Agencies which had been alerted to the spill, began assembling in Bahía Sucia together with sundry cleanup gear. This force was under the general supervision of the Coast Guard and so remained throughout the cleanup operation.

At about 0830 hours the wind began shifting slightly to the south. A boom was deployed north of the oil in the beach area to keep the oil from moving further along the beach. In view of the fact that the oil was several inches thick, at about 0945 hours a sump was dug next to the shore allowing oil to flow from the sea into it. From here the oil was pumped directly to a tank truck, while additional equipment was rounded up. By 1210 hours [37] the pool in the beach contained by the boom had become quite large, extending in some places 100 yards from shore. The wind was steady from the south-southeast. Throughout the day additional cleanup efforts continued, including the construction of more sumps on the beach. Large holding pits were built next to two of the sumps to store oil and three pumping stations were established.

On March 20 more tank trucks were put in operation. By 1800 hours on that day, 35,000 gallons of oil had been removed from the water. By 1700 hours on March 23 this had increased to 405,000 gallons. Throughout the pumping operation oil purity averaged between 85% and 95%.

In the meantime, although most of the oil from the pool at the entrance to the Bay had moved into the beach area, the situation in the West Mangrove remained substantially unaltered. The reasons for this were varied. The characteristics of the terrain and vegetation made it extremely difficult, if not impossible, to effectively carry out the removal of oil. This, as well as the geographic configuration of that area, prevented any flushing by wave and tide action. Additionally, during the initial five and a half day period, the trade winds blew from the east-northeast during the night and south-southwest during the day at a steady 15–20 knots, thus keeping the oil contained within the mangrove pocket.

To prevent a southerly wind shift from spreading the oil north along the beach, another boom was placed perpendicular to the beach and just north of the original boom. The daily shift in wind created a slow current from north to south and vice versa. Meanwhile the oil against the boom reached 4 to 6 inches in thickness. This, together with the current, caused various failures in the containment system which had to be corrected by improved anchoring of the boom.

During the early afternoon of March 24, the winds began to veer past their usual southeasterly limit and moved to west of south. This increased the pressure of the oil on the booms already in place and these began to fail. Oil from the West Mangrove

---

36. The Bahía Sucia area is subject to two tides per day. The highest spring tide occurred on March 18, when it was full moon. The following is the height of the spring tides on the relevant days:

 March 17, 1973 1.2 feet
 March 18, 1973 1.3 feet
 March 19, 1973 1.3 feet
 March 20, 1973 1.3 feet
 March 21, 1973 1.2 feet

37. At about this time some of the cleanup personnel and equipment had to be diverted to contend with a portion of the main body of the slick, which had rounded Cabo Rojo and turned north in the Mona Passage, and was threatening the beach at Punta Aguila. This threat never materialized.

started to move north into the Bay, off-shore and past the boom. By 1830 hours there was a large slick extending from the West Mangrove to the north, with about 50% passing the northernmost boom. The work crews proceeded to close the sea water intake channel of the salt works located just before the western edge of East Mangrove. It was also discovered that oil was touching the westernmost stand of East Mangrove. At this point the wind died, resurging from the north at 2330 hours. An additional 1½ miles of beach were fouled by this episode.

The wind remained northerly throughout the night and at 0800 hours of March 25 was still from the north-northeast at 4 to 6 knots. The oil moved away from the East Mangrove's edge and a large black slick covered most of Bahía Sucia, heading south-southwest. A large portion of this slick went out to sea around Cabo Rojo, but the remainder went back to the original areas at the rocky entrance and at the West Mangrove, accumulating there in fairly heavy thickness. The length of shoreline now impacted was nearly 3 miles. The Coast Guard established a new pumping station in the rocky area, but could do nothing about the oil remaining in the West Mangrove.

At 1300 hours the wind again backed to the south and again threatened the East Mangrove. A boom was placed to prevent this. That night some oil reached the boom. By the morning of the 26th, the normal east-northeast trade wind had returned. Although only 25,000 gallons of oil were removed from the scene during the 42 hours between the various wind shifts, an overflight of the area at 1500 hours revealed that only about 10% of the original oil now remained on the beach area. Of this, the great majority was concentrated at the booms. The remainder was spread along a thin band from the booms south to the original sump.

It became apparent that the West Mangrove had lost at least half of its oil during the wind shifts. Small amounts of oil out of this mangrove began moving towards the original sump area on the 27th. A limited pumping operation was made feasible by this displacement.

The main pumping operations in the northeastern section of the beach continued. By 2000 hours on the 26th of March, 500,000 gallons had been removed by tank truck to the consignee's refinery. By 1900 hours on the 27th this had reached 550,000 gallons, which had increased on the 28th to 590,000 gallons and to 630,000 gallons by March 29. In addition to this amount there were 125,000 gallons stored in reservoirs in the beach awaiting removal, which made a total of 755,000 gallons of oil that had been physically removed from the water in the beach area since the start of operations.

Late during the 28th of March the wind veered to the south and large slicks moved out of the mangroves and into the beach area. Late that evening the wind went even further west. On the morning of the 29th the wind was southwest to west-southwest at 4 to 6 knots. There were black slicks throughout the bay headed for the East Mangrove. As the wind continued from southwest to west-southwest during the entire day, oil impacted the entire shore, from the westernmost point of the East Mangrove to Punta Molino and around this point to the east, nearly to Punta Pitahaya. The physical size of the area involved was tripled, although the new zone was not hit by heavy concentrations of oil.[38]

From the 29th of March until the 3rd of April the winds remained variable and the oil slick moved back and forth in Bahía Sucia. A large slick rounded Cabo Rojo and brought traces of oil into the Mona Passage.

By the 1st of April, the pumping operations were over. Cleanup operations continued in the rocky entrance area and in the beach area between the boom and the com-

---

**38.** This made the cleanup even more difficult because the oil could not be quickly pumped out.

mencement of the East Mangrove, an area where a thin layer of oil was located away from the shore. An additional boom was deployed to completely enclose the West Mangroves, and this boom, which extended approximately 3500 feet, was in place by April 3. When the trade winds returned, oil started to move out of the East Mangrove and the mangrove east of Punta Molino. An additional 500 feet of boom were placed at the western end of the East Mangrove to contain this oil.

By this time, the most important cleanup operation that remained involved a manual beach cleanup. This consisted principally of raking oil soaked sand and sea grasses above the waterline for eventual removal by dump truck.

On April 5, core samples revealed that oil penetration of the sand in the intertidal zone averaged 8 to 10 inches and in some places was as much as 14 inches deep. Further samples taken on April 12 disclosed that this thickness was rapidly decreasing.

In the West Mangrove the cleanup was extremely laborious. Heavy equipment became stuck in the soft ground. The mangrove was so dense that in many places it was impossible to enter it without destroying it. Pockets were cleaned several times, yet oil would leak out from under the mangrove roots. Twelve aluminum boats were used as floating containers for oily sorbents and debris. Free oil was bailed up with buckets and oily sea grass forked directly into the boats. When filled, the boats were towed back to an access point on shore and emptied. A dump or tank truck would then remove the matter to the Mayaguez public sanitary land fill dump, about 20 miles away.

The surface of the tidal flat behind this mangrove was covered by a thin layer of weathered oil which, as stated previously had reached the area on the first night after the spill. Because this is a breeding area for small crabs, it was agreed that it was best to leave it undisturbed.

In the area of the beach, sumps and reservoirs were appropriately cleaned and filled after emptying, and the contaminated sand removed by dump truck. Substantial oily material was removed from the beach by bulldozer and manual labor. In the shallow water, there were tar deposits that were removed by hand. The heavy equipment operations destroyed considerable vegetation. It is estimated that a total of 4500 cubic yards of contaminated sand were removed during the entire operations.

The East Mangrove was not badly contaminated. The wind aided in pushing most of this oil into the boom, as previously described. Thereafter, the cleanup proceeded manually, which was more feasible in view of better footing on the shore side of this mangrove.

The oil in the area east of Punta Molino was cleaned by natural wind and sea action. This area was secure by April 17.

By the 25th of April all cleanup operations were concluded in the beach areas and East Mangrove, with the exception of the area immediately adjacent to West Mangrove, where operations ended on May 4. The entrance area cleanup had ended on April 14.

Commencing on April 25, the boom encircling the East Mangrove was taken out, and by May 3, only 750 feet were left encircling some pockets in the mangrove. All operations were now concentrated in this area. A long suction hose of some 400 feet was fabricated, which permitted a few isolated pockets of oil to be vacuumed out. However, most of the work was manual.

On May 1, the walls of the salt water works intake channel were sandblasted.

By June 1, the operations in the East Mangrove had been reduced to once a week collections of oily sea grass and sorbent material and by June 6, this schedule was further reduced to once every two weeks. A storm on August 15 provided good flushing action for the mangrove roots.

By September 24, further cleanup operations were deemed futile and thus were discontinued.

### The chemistry of oil and its effects

It is impossible to properly evaluate the extent of damages caused by the oil spill

previously described without a rudimentary understanding of the physical properties of petroleum.

Petroleum, or as it is commonly referred to, crude oil, is a complex mixture of paraffin, naphthalene, and aromatic hydrocarbons, containing small amounts of organic sulfur and very small amounts of nitrogen and oxygen compounds, as well as the traces of various metals. The total analysis of all the chemical substances in oil has not yet been performed. It is scientifically established, however, that the composition of crude oil, as far as compounds containing carbon and hydrogen, runs approximately 20–30% paraffin or aliphatic hydrocarbons, 20–50% naphthalenes, and 15–40% asphalts, each of these compounds having their own chemical and physical characteristics. The variations in these percentages are reflected by the geographic location of the oil field, due to the fact that different vegetation and other organic life matter may go into the original formation of the oil. This has more relevance to this case than just passing scientific interest. This composition in large part has a relationship to the relative toxicity of the oil, and more importantly, because the different sources of petroleum have been catalogued, it permits the identification through "fingerprinting" of petroleum found in the field.

The paraffin or aliphatic hydrocarbons in oil are very unreactive. Mineral oil and vaseline are examples of purified mixtures of paraffin. By virtue of their heavy molecular structure they are virtually nontoxic.

Naphthenes are very complex mixtures of hydrocarbons, naphthenes and alkanes. They are lighter than the aliphatics and thus more toxic.

The aromatic compounds in oil are the most reactive and toxic. Some of these, like benzene and naphthalene have a low boiling point, and although highly poisonous to marine life, evaporate with rapidity.

Hydrocarbons are ubiquitous in nature and are thus found in the environment in many forms beside spilled oil. All organisms whether plant or animal, produce hy-drocarbons in their normal metabolisms. However, several things distinguish petroleum from natural hydrocarbons. Because petroleum is formed under heat and pressure, its hydrocarbons are "scrambled up." Furthermore, petroleum hydrocarbons contain certain hydrocarbon compounds called isprenoids, pristane ($C_{17}$) and phystane ($C_{18}$), whose joint presence is found only in oil of petroleum origin.

By the use of gas chromatography and the determination of the pristane-phytane ratio in the oil, it is possible to identify its source. This is true even after the weathering of the petroleum, because these ratios remain fairly constant throughout its life.

The analysis of petroleum for positive identification is also possible by the use of infrared spectrography and atomic absorption spectrophotometry for a determination of the vanadium-nickel, and sulfur-nitrogen ratios.

The evidence in this case clearly establishes that the oil found in Bahía Sucia and that carried aboard the COLOCOTRONI were identical: Tia Juana crude, medium. From this evidence as well as the evidence of the physical coverage of the oil spill, it can not be doubted that the source of the oil in Bahía Sucia was the COLOCOTRONI.

In terms of affecting the environment, when oil is spilled it generally exhibits the following pattern. The aromatic fractions, which as stated previously are the most toxic, evaporate within the first few hours or days. In the meantime, they have lethal effects on marine organisms that come in contact with them. Particularly susceptible to this phenomenon are the epibenthic and benthic communities in shallow waters such as those of the Bahía Sucia estuary. The heavier fractions of petroleum, specially in the initial phases of a spill, operate more as a mechanical than a chemical impediment. The oil, which is initially lighter than water, floats on the surface. Its dark color causes a rise in the temperature of the water below its surface. This affects the flora and fauna, some of which are highly sensitive to temperature changes. Additionally, the ox-

ygen exchange in the water and air are also impeded. As the sun and air contact cause the lighter fractions to evaporate, the remaining heavier fractions become more viscous. These thicker portions kill the various marine organisms, particularly in the intertidal zones, mainly by preventing movement and by interfering with gas exchange. With time, some oil settles into the sediment. There the process of decomposition is very slow, being catalyzed only by anaerobic bacteria. Although in this state the oil is probably neutral in its effect on the various epibenthic and benthic infaunal communities, it allows a disproportionate number of distress area organisms, such as *capitella* worms and blue-green algae, to displace the normal communities. Furthermore, for a prolonged period of time walking on the affected bottoms brings forth a sheen of oil and coats the contact surfaces with a black substance.[39] With the passage of time, the oil that coats the surface and is in direct contact with oxygen and sunlight weathers to the point of becoming tar and has no further ascertainable effect on the environment.

*Detail of damages caused by the oil spill*

Bahía Sucia was heavily impacted by oil as a result of the COLOCOTRONI incident. Most affected were the West Mangrove and beach areas and consequently the flora and fauna of that locale. Immediately after the spill, and as a result thereof, the mangrove root communities in that area were decimated. A similar result was experienced by the sea grass communities in those impact areas and the crab populations in the flats. Additionally, various areas of red mangrove in the West Mangrove were af-

fected by the spill, and as a result the mangrove mortality in this area was significantly increased.

Even at present the mangrove community in this impact area shows a significant reduction in the number of species of macrobiota, the number of molluscs and crustaceans, the epiflora cover, the number and frequency of epiphyte species, and the number of species and population density of epibenthic and in faunal molluscs and crustaceans. The seagrass community shows a significantly altered pattern of plant biomass[40] and in the number of species and population density of macrobiota. This community, however, shows greater relative recovery than the West Mangrove community.

In our opinion, the oil spill damages to the East Mangrove are of minor significance to this case.[41]

From the above, the following specific damage was caused to the Commonwealth Plaintiffs:

1. Plaintiffs' proven claim of damage to marine organisms covers an approximate area of about 20 acres in and around the West Mangrove. The surveys conducted by Plaintiffs reliably establish that there was a decline of approximately 4,605,486 organisms per acre as a direct result of the oil spill. This means that 92,109,720 marine animals were killed by the COLOCOTRONI oil spill. The uncontradicted evidence establishes that there is a ready market with reference to biological supply laboratories, thus allowing a reliable calculation of the cost of replacing these organisms.[42] The lowest possible replace-

---

**39.** The amount of time is the subject of much controversy. Suffice it to say that 5 years after the spill oil was still much in evidence, particularly in the West Mangrove areas visited by the Court.

**40.** As previously stated, of critical importance to the marine food chain.

**41.** More accurately stated, Plaintiffs have failed to support their claims for damages in that area.

**42.** As explained previously, the affected flora and fauna were part of a trust held for the people by the Commonwealth of Puerto Rico. See, *Lacoste v. Department of Conservation*, 263 U.S. 545, 549, 44 S.Ct. 186, 68 L.Ed. 437 (1924); *Geer v. Connecticut*, supra. Perforce, the Commonwealth must have the ability to have the corpus of said public trust reimbursed for the diminution attributable to the wrongdoers. *State Dept. of Environmental Protection v. Jersey Central Power & Light Co.*, supra, at 673–674. We recognize that no market value, in the sense of loss of market profits,

ment cost figure is $.06 per animal, with many species selling from $1.00 to $4.50 per individual. Accepting the lowest replacement cost, and attaching damages only to the lost marine animals in the West Mangrove area, we find the damages caused by Defendants to amount to $5,526,583.20.

2. The evidence is overwhelming to the effect that the sediments in and around the West Mangrove continue to be impregnated with oil. The solutions proposed by Plaintiffs to this problem are unacceptable in that they would bring about the total destruction of this environment without any real guarantee of ultimate success. Furthermore, there is substantial scientific evidence to the effect that much of the undesirable effects of the oil in the sediments will be corrected in time by the weathering processes of nature. The most affected spots in the West Mangrove cover an area of approximately 23 acres. It is the Court's opinion that these areas can best be reestablished by the intensive planting of mangrove and restoration of this area to its condition before the oil spill. The evidence shows that the planting of mangrove runs at about $16,500 per acre, thus bringing the cost of replanting 23 acres to $379,500. The evidence further demonstrates that the planting will require a five year monitoring and fertilizing program which will cost $36,-000 per year or $180,000 for the five years. The total damages thus suffered by Plaintiffs by reason of the pollution of the mangrove in the West Mangrove amount to $559,500.

3. Plaintiffs incurred in cleanup costs in the amount of $78,108.89 which were not reimbursed from any source, and they are entitled to recover said damages from Defendants.

### UNITED STATES' REQUEST FOR INTEREST, PENALTIES AND ATTORNEYS' FEES

On November 8, 1977, the second day of trial, the Defendants moved for summary

judgment in favor of the United States in the full amount of the Government's cleanup claim, i. e., $677,660.42. The Court granted Defendants' Motion, whereupon the participation of the United States was limited to the issues of interest, penalties and attorneys' fees. We proceed to address these questions separately.

### The question of prejudgment interest

We are called upon to decide whether the United States is entitled to prejudgment interest on the amount awarded to it for its total oil pollution cleanup expenses, and if so, from what date and at what percent. A brief summary of the relevant factual background is pertinent to this endeavor.

Just as the oil slick from the Colocotroni impacted the shore at Bahiá Sucia, the United States and the Commonwealth of Puerto Rico began to undertake the massive and painstaking cleanup operations that have been described in the present opinion. Those efforts to thwart and ameliorate the devastating potential of the spill continued until no further cleanup was feasible.

At the incipient stages of the operations, attempts were being made by the Coast Guard in San Juan to identify and contact the responsible party. At 0805 on March 19, a Mobil Oil Company representative informed the Coast Guard that he expected Mobil to assume full cleanup responsibility, but had not yet received confirmation from the head office in New York. About an hour and a half later said representative indicated that Mobil was trying to obtain permission from the vessel's owner to clean up the oil at the direct expense of the owner. Meanwhile, the Commonwealth Government moved to have the ship restrained until the responsibility for the occurrences could be ascertained and worked out.

---

can be ascribed to the biological components of the Bahía Sucia ecosystem. The Court will thus refer to market cost as the most reliable evidence of the quantum of damages actually sustained, i. e., what is required to make the

Plaintiffs whole. This will comprise the cost of restoring the affected areas to the condition in which they were before the occurrences. See *Feather River Lumber Co. v. United States*, 30 F.2d 642, 644 (C.A. 9, 1929).

Initially, the Public Works Department of Puerto Rico assumed the responsibility of subcontracting equipment. This department was given full assurance that the Coast Guard would assume full financial responsibility should the polluter refuse to accept the costs of the cleanup. An oil pollution fund was then requested and granted by the Commander, Seventh Coast Guard District at 1600.

At 1605 a call was received from the Mobil Office in New York. Mobil informed that it would not accept the costs, but that they were attempting to contact the insurance underwriters for the vessel's Federal Maritime Commission (FMC) bond. At 1932 the first call was received from this P & I Club, which was identified as the West of England Steamship Owners Protection and Indemnity Association, Ltd.

The next contact between the Coast Guard and the P & I Club occurred in the morning of March 20. The underwriters had appointed Captain William Coleman as their local representative. On March 21, at 0800 hours a meeting was held between Coast Guard representatives, members of the Environmental Protection Agency, Region II Office, Captain Coleman and Mr. George Freehil, New York representative of the underwriters. The representatives stated that the underwriters would assume all cleanup costs, commencing from the initial response. It was agreed that Commonwealth personnel would continue working under Coast Guard direction and that the underwriters would have personnel on the scene to handle finances.

The next meeting with the underwriters' representatives took place on March 30.[43] In that meeting, the underwriters stated that they were not sure of their legal responsibility if the limits of their policy liability under the Federal Water Pollution Control Act were exceeded. In view of this

hesitancy, the Coast Guard acted to accept full payment responsibility for all costs incurred to insure rapid cleanup of the oil before further damage was done. All the cleanup operations were thus coordinated and paid for by the Coast Guard until their conclusion.

The total oil pollution cleanup expenses incurred by the United States Coast Guard amounted to $677,660.42[44] of which the last cost was incurred by the United States on November 4, 1974. Thereafter, on November 12, 1974, a bill for reimbursement of that amount was sent to Defendant Marbonanza, care of its attorneys in San Juan. That bill had six recapitulation pages attached. No supporting documents were included.[45]

The United States' cleanup costs were paid by the Defendants on April 27, 1978, nearly six months after they moved for judgment in that amount.

The United States contends that it is entitled to prejudgment interest at a rate of eight percent. Respecting the group of payments incurred on or before July 19, 1973, interest is requested from that date up to the fifth of the nearly six months its principal cleanup claim went unpaid after the Court granted Defendants' Motion for Summary Judgment. As to the second group, which comprises payments made by November 4, 1974, the Government prays for an eight percent interest to be computed from that date, up to the fifth month after November 8, 1977.

 The granting of prejudgment interest lies within the discretion of the Court. *San Juan Trading Co. v. The Marmex*, 107 F.Supp. 253 (D.C.P.R., 1952), aff'd 212 F.2d 206 (C.A. 1, 1954), cert. denied 348 U.S. 822, 75 S.Ct. 36, 99 L.Ed.2d 648. However, admiralty jurisprudence generally recognizes an injured party's entitlement to

---

**43.** In the interim, great efforts were being made to pump out and control the oil slick.

**44.** This precise figure was the subject of Defendants' Motion for Summary Judgment which was granted from the bench on November 8, 1977.

**45.** The supporting documents were mailed to counsel Santiago on October 11, 1977 and received by him on October 13, 1977.

prejudgment interest whenever damages lawfully due are withheld, unless there are compelling factors to justify its denial. *Grace Lines, Inc. v. Todd Shipyards Corp.,* 500 F.2d 361, 366 (C.A. 9, 1974); *Ore Carriers of Liberia, Inc. v. Navigen Co.,* 305 F.Supp. 895, 896, (S.D.N.Y., 1969), aff'd 435 F.2d 549 (C.A. 2, 1970); *Illigan Int'l Corp. v. S.S. John Weyerhauser,* 372 F.Supp. 859, 869 (S.D.N.Y., 1974), aff'd, remanded on other grounds 507 F.2d 68 (C.A. 2, 1974), cert. den. 421 U.S. 965, 95 S.Ct. 1954, 44 L.Ed.2d 452 (1975). This general rule is grounded on compensatory considerations, in consonance with the general purpose of awarding damages, which is to try to make the injured party "whole". *Rosa v. Ins. Co. of State of Pennsylvania,* 421 F.2d 390, 393 (C.A. 9, 1970); *Interstate Steel Corp. v. S.S. Crystal Gem,* 317 F.Supp. 112, 122 (S.D. N.Y., 1970); also see, *Rugo Const. Co. v. New England Foundation Co.,* 172 F.2d 964, 967 (C.A. 1, 1949).

 Section 311(f)(1) of the Federal Water Pollution Control Act, 33 U.S.C. § 1321(f)(1), provides in its pertinent part:

"Except where an owner or operator can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party . . . such owner or operator . . . shall . . . be liable to the United States Government for the *actual* costs incurred . . . for the removal of such oil . . . ." (emphasis added).

Recovery under this statute is measured by the Government's actual costs regardless of their reasonableness. *Burgess v. M/V Tamano,* 564 F.2d 964, 983 (C.A. 1, 1977), cert. den. 435 U.S. 941, 98 S.Ct. 1520, 55 L.Ed.2d 537 (1978). Since "interest" constitutes damages for the delay in the payment of money, *Nicodemisen v. The Dartmouth,* 157 F.Supp. 339 (D.C.Mass., 1958), its award is clearly appropriate under the above quoted section. As the Supreme Court stated in *Rodgers v. United States,* 332 U.S. 371, 68 S.Ct. 5, 92 L.Ed. 3 (1947):

". . . [T]he failure to mention interest in federal statutes which create obligations has not been interpreted by this Court as manifesting an unequivocal congressional purpose that the obligation shall not bear interest. For in the absence of an unequivocal prohibition of interest on such obligations, this Court has fashioned rules which granted or denied interest on particular statutory obligations by an appraisal of the congressional purpose in imposing them and in the light of general principles deemed relevant . . . one for whose financial advantage an obligation was assumed or imposed, *and who has suffered actual money damages* by another's breach of that obligation, should be fairly compensated for the loss thereby sustained." *Id.,* at 373, 68 S.Ct. at 7 (emphasis added).

The Defendants oppose the Government's request for prejudgment interest on the following grounds: (1) that the entire responsibility for all oil spill cleanup operations was with the Coast Guard and that at no time the Defendants were ordered to clean up the oil; (2) that the United States has not been out-of-pocket, because the Federal Water Pollution Control Act has expressly created a National Contingency Fund to finance the costs of oil cleanup in navigable waters; (3) that at no time subsequent to the meeting of March 21, 1973 did any representative of the United States ever make a demand on the vessel's underwriters "to handle the finances"; (4) that although the Coast Guard mailed an invoice for the cleanup costs in November of 1974 no effort was made to support the bill until the eve of trial; (5) that the United States never made any attempt to obtain payment against a Certificate of Insurance posted by the West of England with the Federal Maritime Commission; (6) that the Government was derelict in prosecuting its claim by not opposing the Court's order consolidating it with the Commonwealth's suit for environmental damage and that this self-serving delay cannot be invoked as grounds for the recovery of interest.

■ Under Section 311(c)(1) of the Federal Water Pollution Control Act, the United States is empowered to remove or arrange for the removal of oil, unless it is determined that "such removal will be done properly by the owner or operator of the vessel . . . from which the discharge occurs." 33 U.S.C. § 1321(c)(1). However, in the case at bar this provision cannot logically be read as immunizing the vessel's owners from making the United States whole for the cleanup costs incurred by it.

It clearly transpires from the record in this case that the seriousness of the COLO-COTRONI's oil spill required urgent, immediate and effective action. Considering the problems encountered by the Coast Guard in pinpointing the responsible parties, the idleness of the Defendants while the operations were taking place, their failure to take clear and affirmative steps to adhere to their avowed intention to handle finances and their hesitancy to assume responsibility at such a late date as March 20, it is beyond our comprehension how an effective oil removal by the owners or the underwriters could then be feasible. In view of these factors we fail to grasp how an appropriate exercise of the Government's statutory obligations can be invoked as a ground for denial of compensatory interest.[46]

Defendants' asserted willingness to pay since the incipient stages of the cleanup endeavors lacks support in the record. Although Defendants made a verbal commitment to handle finances "on the scene", the Coast Guard was at all times compelled to assume responsibility for coordinating the cleanup and for making payments. There may have been no express requests to pay a particular bill, but we are satisfied as to the negotiating efforts that were being made by the United States concerning the problems of financing.[47]

Nor was this willingness to pay discernible at the litigation phase. The United States action was instituted within a month

after the occurrences and a bill in the exact amount which was eventually paid by the Defendants was forwarded to them on November 12, 1974.

Defendants nevertheless argue that they were not required to pay that bill until they received the supporting documentation during the latter part of October, 1977.

It is our opinion that when the 1974 bill was sent to the Defendants, the amount owed by them became sufficiently liquidated and made certain. Cf. St. Louis Testing Laboratories, Inc. v. Mississippi Val. Structural Steel Co., 254 F.Supp. 47 (D.C.Mo., 1966), aff'd 375 F.2d 565 (C.A. 8, 1967). They were thereupon placed in a position where serious steps should have been taken either to contest the bill or to verify its accuracy. However, the Defendants completely failed to challenge the bill's sufficiency, much less to acknowledge it or demonstrate any interest in satisfying their obligation.

Defendants' belated attempt to hold the Plaintiffs accountable for not proceeding against the FMC bond smacks of an afterthought. We agree with the Plaintiff that it was not required to forego its action against the principal and its Protection and Indemnity carrier to go against the bond posted with the Federal Maritime Commission. In its role as bond underwriter, the West of England never attempted to open payment negotiations with the United States. Undoubtedly, the United States had the right not to desist from its claim against the insured, specially since, as the Defendants themselves concede, they could have been entitled to deny liability under said certificate of insurance.

■ Defendants correctly argue that delay on the part of an injured party to press his claim to conclusion is a factor which may prevent recovery of prejudgment interest. See, San Juan Trading Co. v. The Marmex, supra, at 260 (D.C.P.R.,

46. The argument that the United States could not have been deprived of the use of monies charged to a special fund is so spurious that it deserves no discussion.

47. The Coast Guard Report characterizes the episode as "tedious and frustrating negotiations with the underwriters." Exh. 20, p. 51.

1952); *Mid American Transportation v. Rose Barge Line,* 477 F.2d 914 (C.A. 8, 1973). But this general principle is not applicable to this litigation. The contention that the United States was derelict in prosecuting the instant action by failing to oppose consolidation does not convince us of the contrary. Suffice it to say that this curious proposition presents to this Court the untenable alternative of chastising a party for not requesting the severance of adequately consolidated actions. We refuse to so act, specially when the Defendants themselves did not oppose the consolidation.[48]

■ The foregoing considerations convince us that the United States is entitled to prejudgment interest. In determining the starting date for its computation, we are mindful that the general rule in admiralty favors the award of interest from the date of the loss or casualty. See *Moore McCormack Lines, Inc. v. Amirault,* 202 F.2d 893, 898 (C.A. 1, 1953); *Geotechnical Corp. of Delaware v. Pure Oil Co.,* 214 F.2d 476, 477–478 (C.A. 5, 1954); *Alcoa S.S. Co. v. Charles Ferran & Co.,* 443 F.2d 250, 256 (C.A. 5, 1971), cert. den., 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 94 (1971). But this general rule is of course subject to excep-

tions, giving regard to the particular circumstances presented by each case and in accordance with the Court's discretionary powers. E. g., *Aegean (Shipbrokers') Limited v. Henriksen's Rederi A/S,* 165 F.Supp. 939 (D.C.Mass., 1958).

■ The instant action cannot be blindly encased in the confines of a typical admiralty claim. Prior to the date when the Government first sent a bill, the claims were unliquidated and unascertained. We think that an award of interest from the date of liquidation adequately satisfies the compensatory policy set forth in 33 U.S.C. § 1321(f)(1).

Considering all the equities involved, the United States is hereby awarded a six percent (6%)[49] interest from November 12, 1974, date of the initial invoice[50] to April 8, 1978.[51]

*The aspect of statutory penalties*

The Federal Water Pollution Control Act, at 33 U.S.C. § 1321(b)(3) provides in its pertinent part:

"The discharge of oil or hazardous substances (i) into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of

---

**48.** The Defendants rely on a letter by the former Executive Director of the Commonwealth's Environmental Quality Board (Defendants' Exh. 44) as supportive of the view that the reason why the Government "hesitated in bringing its case on for trial" was that the United States was in effect financing the Commonwealth's case. That letter evinces a grant by the Federal Environmental Protection Agency in the amount of $162,732, assigned for "the legal pursuit of redress for damages to the environment that were caused by the dumping of oil from the . . . COLOCOTRONI."

In our opinion, that budgetary assignment by E.P.A. cannot be characterized as champerty and maintenance of the Commonwealth's suit on the part of the United States, insofar as it was in harmony with the Congressional policy "to support and aid research relating to the prevention, reduction, and elimination of pollution, and to provide Federal technical services and financial aid to State and interstate agencies and municipalities in connection with the

prevention, reduction, and elimination of pollution." 33 U.S.C. § 1251(b).

**49.** The United States, albeit it prays for an award of 8%, acknowledges that it knows of no case awarding a rate in excess of that allowed by the State where the Court sits. The rate of six percent established in 31 L.P.R.A. 4591, 3021 will not be exceeded.

**50.** Cf. *Van Nievelt Goudriaan Co.'s Stoom M. v. Cargo & T. Mann. Corp.,* 421 F.2d 1183 (C.A. 2, 1970); *Wahl v. Carrier Mfg. Co., Inc.,* 511 F.2d 209 (C.A. 7, 1975); *Carter Products, Inc. v. Colgate-Palmolive Co.,* 214 F.Supp. 383 (D.C. Md., 1963); *Aegean (Shipbrokers') Limited, v. Henriksen's Rederi A/S,* supra.

**51.** This includes the requested interest for five months after our granting of Defendants' Motion for Summary Judgment, as clearly authorized by 28 U.S.C. § 1961.

**1350**

the contiguous zone . . . is prohibited" . . .

In turn, 33 U.S.C. § 1321(b)(6) reads in part:

"Any owner, operator, or person in charge of any vessel from which oil or a hazardous substance is discharged in violation of paragraph (3)(i) of this subsection . . . *shall be assessed a civil penalty by the Secretary of the department in which the Coast Guard is operating of not more than $5,000 for each offense.*" (Emphasis added).

 The principal purpose of this Section is the deterrence of harmful oil spills. *United States v. Atlantic Richfield Co.,* 429 F.Supp. 830 (E.D.Pa., 1977). The statute clearly places the assessment power on the Coast Guard. Because the Coast Guard is charged with the execution of the statutory scheme, great weight must be accorded to its determination. *United States v. W. B. Enterprises,* 378 F.Supp. 420 (D.C.N.Y., 1974).

The parties hereto have stipulated that a maximum penalty of $5,000 was duly assessed by the Coast Guard (Tr. pp. 733–734). The only aspect which was left open to argument was whether or not said penalty should be enforced in this case. (Tr. p. 740).

 The Defendants have acknowledged that penalties may be appropriately assessed under 33 U.S.C. § 1321(b)(6). They further recognize that in this regard they are legally responsible for the acts of the Master of the COLOCOTRONI. Under these circumstances, and considering the factors surrounding the oil spill in this case, we cannot say that the Coast Guard's decision was either arbitrary or capricious. We are thus duty-bound to sustain the assessment of the maximum penalty. *Matter of Vest Transp. Co., Inc.,* 434 F.Supp. 748 (D.C. Miss., 1977); *United States v. Atlantic Richfield Co.,* supra. Therefore, the same shall be enforced against the Defendants. Plaintiffs are hereby awarded a $5,000 penalty under the Federal Water Pollution Control Act.

We shall now turn to the aspect of the penalties requested by the United States under the provisions of the Rivers and Harbors Act of 1899, 33 U.S.C. § 401 et seq. Section 13 of the Act, 33 U.S.C. § 407, provides, as is herein pertinent:

"It shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged or deposited either from or out of any ship, barge, or other floating craft of any kind . . . any refuse matter . . . into any navigable water of the United States . . ."

Section 16 of the same Act, 33 U.S.C. § 412 reads in part:

. . . "[A]ny boat, vessel, scow, raft, or other craft used or employed in violating any of the provisions of sections 407 . . . of this title shall be liable for the pecuniary penalties specified in Section 411 of this title," . . .

This Act is far reaching in its scope. It prohibits virtually all deposits of foreign matter into the navigable waters, except liquids flowing from streets and sewers. *United States v. Kennebec Log Driving Co.,* 491 F.2d 562 (C.A. 1, 1973), cert. den., 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974). Clearly, oil is "refuse matter" within the meaning of the Act. *United States v. Standard Oil Co.,* 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966); *United States v. Ballard Oil Co. of Hartford,* 195 F.2d 369 (C.A. 2, 1952).

 33 U.S.C. § 411 authorizes the imposition of penalties "not exceeding $2,500 nor less than $500." In setting the amount of these statutory penalties, federal courts possess broad discretionary faculties. See, *United States v. Anaconda Wire & Cable Co.,* 342 F.Supp. 1116 (D.C.N.Y., 1972).

 The gross negligence leading to the COLOCOTRONI's discharge of enormous amounts of exceedingly polluting oil, as well as the seriousness and extremely ad-

verse effect of said oil spill are described in detail elsewhere in this opinion. In view of the quasi-strict liability envisaged in the statute [52] and in the absence of any extenuating circumstances, we are of the opinion that the maximum statutory penalty is more than justified.

Wherefore, a penalty of $2,500 is hereby imposed against the Defendants and in favor of the United States, in accordance with the provisions of 33 U.S.C. §§ 407, 411.

*The United States prayer for attorneys' fees*

The Government contends that Defendants' obstinacy merits an award of attorneys' fees pursuant to the Puerto Rico Rules of Civil Procedure, 32 L.P.R.A. App. II R. 44.4(d). This rule provides:

"Where a party has been obstinate, the court shall in its judgment impose on such person the payment of a sum for attorney's fees."

Our threshold inquiry is whether the quoted rule can lend support to the Government's request in the present action. In this context, it is pertinent to refer to the language of 28 U.S.C. § 2412, as amended by Act of July 18, 1966, Pub.L. 89–507, which provides in part:

"*Except as otherwise specifically provided by statute*, a judgment for costs, . . . *but not including the fees and expenses of attorneys* may be awarded to the prevailing party in any civil action brought by or against the United States . . . in any court having jurisdiction of such action." (Emphasis added).

■ The purpose of this Congressional enactment was to correct inequities in the assessment of costs in civil actions between the United States and private litigants, so that both parties would stand on an equal footing. *Moore v. Winfield City Board of Education*, 452 F.2d 726 (C.A. 5, 1971). On its face it precludes us from entering an award of counsel fees not only against the United States but also in its favor, absent an independent statutory authorization. See 10 Wright & Miller, *Federal Practice and Procedure*, § 2672, p. 170 (1973).[53]

■ This is an action brought by the United States for the recovery of the costs and expenses incurred in removing the oil from the COLOCOTRONI's casualty. The Government's claims for relief are asserted under the Federal Water Pollution Control Act, 33 U.S.C. § 1321(f)(1) and the Rivers and Harbors Act, 33 U.S.C. § 401 et seq. None of the allegations in the Complaint are based on a local statute or rule. It is thus clear to us that in the present case the right to recover attorneys' fees is a matter of federal and not of state law. Cf. *J. E. Robertson Co. v. United States*, 194 Ct.Cl. 289, 437 F.2d 1360 (1971).

■ The Puerto Rican provision for attorneys' fees has been recognized in this Circuit. See, *Pan American World Airways, Inc. v. Ramos*, 357 F.2d 341 (1st Cir., 1966). But the rationale for this recognition is found in the well settled doctrine that commands application of state substantive law in diversity cases. *Ibid.; Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). Hence, resort to Rule 44.4 is only justified where diversity of citizenship is one of the components of the cause. See, *Rivera v. Rederi A/B Nord-*

---

**52.** See *In Re: Scow No. 36*, 144 F. 932 (C.A. 1, 1906); *United States v. The Martin*, 198 F.Supp. 171 (D.C.Ill., 1961), aff'd 313 F.2d 851 (C.A. 7, 1963); *United States v. The Terry E. Buchanan*, 138 F.Supp. 754 (D.C.N.Y., 1956); *The Gansfjord*, 25 F.2d 736 (C.A. 5, 1928).

**53.** This is in harmony with the prevailing "American rule", that goes against the award of counsel fees in the absence of a statute or enforceable contract. *F. D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Co., Inc.*, 417 U.S. 116, 126–131, 94 S.Ct. 2157, 40 L.Ed.2d 403 (1974); *Fleischman Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 717–718, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967).

*stjernan*, 456 F.2d 970 (C.A. 1, 1972); *City Bank of Honolulu v. Rivera Dávila*, 438 F.2d 1367 (C.A. 1, 1971); *Carrillo v. Westbulk*, 385 F.Supp. 119, 126 (D.C.P.R., 1975); *De Thomas v. Delta S.S. Lines, Inc.*, 58 F.R.D. 335, 344 (D.C.P.R., 1973); also see, *Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, n. 31, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).[54] Such is clearly not the case here.

Also lacking is any federal statutory authority for an award of attorneys fees in this case. The citizen suits' provision of the Federal Water Pollution Control Act, 33 U.S.C. § 1365(d) reads:

> "The court, in issuing any final order *in any action brought pursuant to this section*, may award costs of litigation (including reasonable attorney[s] . . . fees) to any party, whenever the court determines such award is appropriate."

 Congress clearly circumscribed its allowance of attorneys' fees under the Act to citizen suits brought under 33 U.S.C. § 1365. This is of course understandable as a reiteration of the Congressional goal of encouraging private litigation directed to implement public policy. *Alyeska Pipeline Co. v. Wilderness Society*, supra, at 263, 95 S.Ct. 1612. As the Supreme Court clearly stated in the cited case:

> . . . "[T]he circumstances under which attorneys' fees are to be awarded and the range of discretion of the courts in making those awards are matters for Congress to determine." 421 U.S. at 262, 95 S.Ct. at 1624.

The United States' prayer for attorneys' fees is denied on the aforementioned grounds.

Considering the above, the Clerk is ordered to enter Judgment as follows:

1. In Case Number 252–73 for Plaintiffs against Defendants in the amount of $6,164,192.09, with costs.

2. In Case Number 309–73 for Plaintiff against Defendants for interest at 6% on $677,660.42 commencing November 12, 1974 through April 8, 1978, and civil penalties in the amount of $7,500.

IT IS SO ORDERED.

Appendix A to follow.

---

**54.** The award of attorneys' fees in maritime non-diversity actions is premised on the inherent equity faculties with which courts have been traditionally invested. E. g., *Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962). Thus, any resort to the Commonwealth's rule in those cases, although technically questionable, would achieve a result not inconsistent with this equitable exception. See *Santiago Martínez v. Compagnie Generale Transatlantique*, 517 F.2d 371 (C.A. 1, 1975). However, Courts are deprived of those faculties where, as here, counsel fees are forbidden by Congress. *Alyeska Pipeline Co. v. Wilderness Society*, supra, 421 U.S. at 259, 95 S.Ct. 1612.

EAST MANGROVE

BAHIA SUCIA

Punta
Molino

Salinas

WEST MANGROVE ✳Roca Ola

Hermit One

Dogman's Cove

BOSQUE ESTATAL
DE BOQUERÓN

↑
NORTH

CABO ROJO

Faro

APPENDIX A

This is a Section of U.S. Geologic
Survey Map for the Cabo Rojo, P.R
Quadrangle.
(N.175.2-W6707.5/7.5 -1966),
 Scale 1:20,000.